Alan B. MILLER, Trustee in Bankruptcy
of American IBC Corp.,
Bankrupt, Appellee,

v.

WELLS FARGO BANK INTERNATION-
AL CORP., Appellant.

No. 1071, Docket 76–5004.

United States Court of Appeals,
Second Circuit.

Argued May 21, 1976.

Decided July 15, 1976.

Charles L. Stewart, Dunnington, Bartholow & Miller, New York City, (Roger R. Crane, Jr., Dunnington, Bartholow & Miller, New York City), for appellant.

Harvey R. Miller, Weil, Gotshal & Manges, New York City, (Robert A. Weiner, Frederick J. Leffel, Weil, Gotshal & Manges, New York City), for appellee.

Before LUMBARD, ANDERSON and OAKES, Circuit Judges.

OAKES, Circuit Judge:

Arbitrage in foreign exchange—the simultaneous purchase and sale of foreign currency in order to profit from discrepancies between the sales price and the purchase price in separate markets—is a relatively sophisticated form of investment, and properly conducted may be entirely risk-free to the investor. Such a transaction

may be equally risk-free, though even more exotic, when it includes the following steps:

(A) the arbitrager borrows dollars from a New York bank;

(B) these dollars are used to purchase Swiss Francs, which are deposited in the arbitrager's time deposit account at a European bank;

(C) simultaneously with step (B), the arbitrager contracts with a Swiss bank to sell the Swiss Francs it has deposited in the European bank (plus the interest, payable in Swiss Francs, accruing in that account) at a date six months in the future—the contractual terms are such that the arbitrager will receive more dollars for his Francs when he sells to the Swiss bank after six months than he paid to obtain the Francs at the date the contract was made;[1]

(D) after six months the Swiss Francs in the time deposit at the European bank (plus interest) are sold to the Swiss bank for dollars in accordance with the contract, and the proceeds are remitted by the Swiss bank to the arbitrager's account at the New York bank;

(E) the New York bank then deducts the principal amount of the sum lent, plus accrued interest, from the arbitrager's account;

(F) the difference between the amount deposited in the arbitrager's New York account in step (D) and the amount deducted from that account in step (E) represents the arbitrager's profit on the transaction.

Involved in this appeal are two such transactions initiated when appellant, Wells Fargo Bank International Corp. ("the New York Bank"), loaned $1,000,000 in each case to an international currency dealer, American IBC Corp. (AIBC), which used the proceeds to conduct the two arbitrage transactions in the more exotic form just suggested. The money earned from the foreign currency on the European time deposit, coupled with the price discrepancy on the simultaneous purchase and future sale of Swiss Francs, was to offset the total interest to be paid on the loan and leave the arbitrager, AIBC, with a profit of approximately 2/10 of one per cent on the overall transaction.[2] This was a profit that was, financially speaking, risk-free, note 1 *supra.* Similarly, the lending bank, the New York Bank, was to obtain a relatively good rate of interest in these transactions which it thought would "automatically unwind" so that in the end it would be repaid its principal and the interest out of the proceeds of the future sale back of the Swiss Francs, purchased and placed on time deposit by AIBC.

Unfortunately, the arbitrager or currency dealer went bankrupt less than four months after the loans were repaid to the lending bank out of the proceeds of the future sales of the Swiss Francs. The United States District Court for the Southern District of New York, Milton Pollack, *Judge,* held that the payments should be set aside as preferential transfers under Section 60(a)(1) of the Bankruptcy Act, 11 U.S.C. § 96(a)(1).[3]

---

1. The Swiss Bank was obviously speculating that Swiss Francs would rise in value, relative to the dollar, at a rate higher than was contracted for, during the six-month period. The "risk free" nature of this transaction for the arbitrager stems from the fact that it is the Swiss Bank, rather than the arbitrager, that is engaging in the speculation.

2. The transactions were designed in such a way that on the two six-month loans of $1,000,000 the arbitrager was to gain a profit of $2,147.70 and $2,977.38, respectively. *Miller v. Wells Fargo Bank International Corp.,* 406 F.Supp. 452, 462 n.1 (S.D.N.Y.1975).

3. Section 60(a)(1) and (2), 11 U.S.C. § 96(a)(1), (2), provides:

(1) A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.

(2) For the purposes of subdivisions (a) and (b) of this section, a transfer of property other than real property shall be deemed to have been made or suffered at the time when it became so far perfected that no subsequent lien upon such property obtainable by legal or equitable proceedings on a simple contract

The court found that the New York Bank had reasonable cause to believe that AIBC was insolvent at the time of the two loan repayments, Section 60(b), 11 U.S.C. § 96(b),[4] and that the six statutory prerequisites to a Section 60(a) preference was all fulfilled in this case.[5] *Miller v. Wells Fargo Bank International Corp.*, 406 F.Supp. 452 (S.D.N.Y.1975). While we agree with much of Judge Pollack's quite comprehensive opinion, this opinion is made necessary because appellant's line of attack on appeal varies from that in the district court.

The two arbitrage transactions involved in this case are somewhat different factually and involve different legal questions on appeal. We will therefore describe and discuss them separately.

*The first transaction.* AIBC had a business relationship with the New York Bank, which is an international bank wholly owned by but operated independently from Wells Fargo Bank, N.A., of San Francisco. In April, 1973, AIBC approached the New York Bank with a proposal for a currency arbitrage transaction with the Swiss Credit Bank in Zurich (the Swiss Bank). The New York Bank approved the proposal and on May 3, 1973, loaned AIBC $1,000,000 at 8 per cent interest, to be repaid on November 2, 1973. On May 3, AIBC used the $1,000,000 to purchase 3,240,000 Swiss Francs from

the Swiss Bank and simultaneously agreed to resell 3,308,850 Swiss Francs to the Swiss Bank on November 2, 1973, for $1,042,-814.37. The difference of 68,850 Swiss Francs in the amount purchased and sold by AIBC was exactly equal to 4.25 per cent per annum interest earned on the six-month time deposit of the 3,240,000 Swiss Francs, a deposit made in Wells Fargo Luxembourg (the Luxembourg Bank), which is a European branch of Wells Fargo Bank, N.A. The time deposit contract was entered into simultaneously with the loan and with the separate purchase and resale agreement with the Swiss Bank.

Everything went smoothly. On November 2, 1973, the Swiss Bank forwarded the resulting $1,042,814.37 to the New York Bank, which credited the AIBC account in the New York Bank with the transfer and debited it with the sum of $1,040,666.67, representing the $1,000,000 principal and 8 per cent interest due on the six-month loan. AIBC's profit on the entire transaction was thus a mere $2,147.70.

On appeal, the New York Bank has employed what might be called a shotgun approach. It claims that it had a valid assignment of a security interest in the Luxembourg time deposit either by virtue of the exchange of correspondence between AIBC and it on April 30 and May 2, respectively,[6]

---

could become superior to the rights of the transferee. . . . If any transfer of real property is not so perfected against a bona fide purchase, or if any transfer of other property is not so perfected against such liens by legal or equitable proceedings prior to the filing of a petition initiating a proceeding under this title, it shall be deemed to have been made immediately before the filing of the petition.

4. Section 60(b), 11 U.S.C. § 96(b), provides in part:

Any such preference may be avoided by the trustee if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent. Where the preference is voidable, the trustee may recover the property or, if it has been converted, its value from any person who has received or converted such property, except a bona-fide purchaser from or lienor of the debtor's

transferee for a present fair equivalent value . . . .

5. In order for there to be a finding of a preferential transfer under Section 60(a)(1) of the Bankruptcy Act, 11 U.S.C. § 96(a)(1), each of the following must be proven: The transfer must (1) transfer the property of the debtor, (2) to or for the benefit of a creditor, (3) for or on account of an antecedent debt, (4) at a time when the debtor is insolvent, (5) within four months after the filing of a bankruptcy petition, and (6) enable one creditor to obtain a greater percentage of his debt than some other creditor of the same class.

6. The April 30, 1973, letter of AIBC to the New York Bank provided:

We confirm to you our borrowing from you and lodging with you as collateral for such borrowing, a Swiss Franc time deposit, as detailed below.

or by virtue of a prior so-called 1970 General Pledge Agreement[7] entered into between AIBC and the New York Bank. Appellant also claims that the loan in the first transaction was secured by a pledge of the Luxembourg time deposit. Alternatively, appellant claims that AIBC's time deposit at the Luxembourg Bank should be treated as a "special deposit," similar to a trust, running in appellant's favor.

*The second transaction.* The second transaction involving a loan from the New York Bank to AIBC on May 17, 1973, and repayment, via the Swiss Bank on November 19, 1973, raises quite different issues than the first. While the terms of the two transactions were essentially identical,[8] the

On May 3, 1973 kindly deliver the sum of $1,000,000 to the Chase Manhattan Bank for credit to the account of Swiss Credit Bank, Zurich, reference American IBC Corp.

Swiss Credit Bank Zurich, is delivering for value May 3, 1973 the sum of 3,240,000 Swiss Francs to Swiss Bank Corp. Zurich in favor of Wells Fargo Luxembourg, ref. American IBC Corp. This Swiss Franc sum is placed on time deposit value May 3, 1973 until November 2, 1973 at an interest rate of 4.25% per annum. This deposit is lodged with you as collateral for the One Million Dollar loan and is subordinated to such loan. On May 2, 1973, the New York Bank replied in pertinent part to AIBC:

Confirming our telephone conversation of April 30, 1973, we agree to lend you $1,000,-000 on May 3rd, 1973, at 8% p. a. on a 360-day basis.

The proceeds of our advance will be transferred to Chase Manhattan Bank, for credit of Swiss Credit Bank, Zurich, for account of American I.B.C. Corp. . . .

You have agreed to lodge with us as collateral the Swiss Franc time deposit as outlined in your letter dated April 30, 1973. We are enclosing our usual "Advance Agreement" along with our time note for your execution. [See note 9 *infra* for the "Advance Agreement."]

. . . . .

We wish to quote to your [sic] our telex sent to Wells Fargo Bank, Luxembourg, on May 1, 1973.

. . . . .

SWISS FRANCS WILL BE CREDITED YOUR ACCOUNT AT SWISS BANK CORP. ZURICH BY ORDER SWISS CREDIT BANK ZURICH BY ORDER AMERICAN I.B.C. 770 LEXINGTON AVE., N.Y. AT MATURITY PAY PRINCIPAL PLUS INTEREST TO SWISS CREDIT BANK ZURICH, ATTENTION MR. RIBI SWISS FRANCS 3,308,850 CREDIT DOLLAR EQUIVALENT 1,042,814.-37 TO WFBI FOR ACCOUNT AMERICAN I.B.C. ATTENTION BOLAND.

7. The "General Pledge Agreement" provided in pertinent part:

In consideration of any financial accommodation . . . to be given . . . to the undersigned by WELLS FARGO BANK INTERNATIONAL CORPORATION (hereinafter called Bank), and as collateral security for the payment of all debts, obligations or liabilities . . . the undersigned hereby assign, transfer to and pledge with Bank . . . all money and property . . . which shall hereafter be delivered to or come into the possession, custody or control of Bank in any manner or for any purpose whatever during the existence of this agreement, and whether held in a general or special account or deposit or for safe-keeping or otherwise, together with any . . . other property which the undersigned are or may hereafter become entitled to receive on account of such . . . other property . . . .

. . . . .

At any time, without notice, and at the expense of the undersigned, Bank in its name or in the name of its nominee or of the undersigned may, but shall not be obligated to: . . . (3) enter into . . . any agreement in anywise relating to or affecting the collateral, and in connection therewith may deposit or surrender control of such collateral thereunder, accept other property in exchange for such collateral and do and perform such acts and things as it may deem proper, and any money or property received in exchange for such collateral shall be applied to the indebtedness or thereafter held by it pursuant to the provisions hereof; (4) make any compromise or settlement it deems desirable or proper with reference to the collateral; (5) insure, process and preserve the collateral; (6) cause the collateral to be transferred to its name or to the name of its nominee; (7) exercise as to such collateral all the rights, powers and remedies of an owner

. . . . .

8. The second transaction followed a similar pattern to the first. AIBC borrowed $1,000,000 at 8.5 per cent interest from the New York Bank on May 17, 1973, due November 19. Simultaneously but in a separate transaction it purchased 3,130,000 Swiss Francs from the Swiss Credit Bank on the same date and AIBC and the Swiss Bank contracted for an exchange of the Swiss Francs back into dollars on November 19 at a fixed rate favorable to AIBC, the total Swiss Francs to be transferred on November 19 amounting to 3,183,577.83 resulting in $1,046,894.05 in United States dollars. AIBC also contracted with United California

underlying documentation and the routing of the funds were different. The purchase and future sale of Swiss Francs in both cases were from and to the Swiss Credit Bank. But the bank with which the time deposit was made in the second transaction was not the Luxembourg Bank—affiliate of the New York Bank—but was the entirely independent United California Bank, London (United California). United California did not act as the New York Bank's agent, nor was it requested to do so; there is thus no possibility here, as there may have been with the first transaction, that the time deposit bank held funds in the deposit for appellant as a pledge from AIBC. Further unlike the first transaction, there is no letter from AIBC to the New York Bank "lodging" any collateral to or with the New York Bank. In sum, there is no internal bank documentation indicating that AIBC was providing collateral by way of pledge, assignment, special deposit or otherwise with regard to this transaction. Indeed, the New York Bank did not even obtain a promissory note in connection with the second loan, much less an "advance account agreement" as had been obtained in the earlier transaction.[9] As a result, quite understandably, on this appeal the New York Bank does not make the claim it had raised in the district court that it had a security interest in respect to the second transaction.

Appellant's claim on appeal is, rather, that repayment of its loan did not result in a diminution of the bankrupt's estate because at the time the funds were transfer-red to the New York Bank they were not the property of the debtor, but of the Swiss Bank. This claim stems from the fact that on August 29, 1973, AIBC wired a Telex to the Swiss Bank directing it to ignore prior instructions to transfer the dollar proceeds of the currency exchange to the New York Bank, and instead to retain the proceeds in repayment of advances the Swiss Bank had previously made to AIBC in wholly unrelated transactions (and as to which the AIBC president was evidently personally liable). While the Swiss Bank apparently intended to comply with these instructions, it mistakenly transferred the dollars to the New York Bank as per its original directions. Appellant claims that the August Telex constituted an assignment of the funds to the Swiss Bank, thereby divesting AIBC of title and right to control over the funds upon receipt by the Swiss Bank. Since the claimed assignment occurred more than four months before the date of bankruptcy, appellant maintains that the transfer *to the Swiss Bank* was not a voidable preference under Section 60(a). And, since the funds were therefore the property of the Swiss Bank, it is argued, the mistaken transfer of the funds to the New York Bank could not have been a preferential transfer of "the property of a debtor. . . ." 11 U.S.C. § 96(a); *see* note 3 *supra.*

**■** *Other matters.* We adopt the district court's findings and statement of law in reference to the New York Bank's having "reasonable cause to believe that the

---

Bank in London for a six-month, 3.25 per cent time deposit to mature on November 19. The $1,046,894.05 was in fact sent by the Swiss Bank to the New York Bank for AIBC's account which credited AIBC with the transfer and debited AIBC's general account $1,043,-916.67 in repayment of the principal and interest due the bank for the May 17 loan, leaving the grand total of $2,977.38 in AIBC's New York account as its profit on this transaction.

9. The advance account agreement in the first transaction read in pertinent part as follows:

As secured party, you are hereby authorized to establish an account or accounts in the name of the undersigned to be designated "Advance Account" and against which you shall debit all drafts drawn on you by us and all advances of every kind and nature which you make to us or at our direction or on our behalf.

. . . . .

We grant you a security interest' in all documents which come into your possession or the possession of any correspondent or agent of yourself or which we receive by reason of payment by you of our drafts hereunder, and also in all goods covered by such documents, whether or not released to us or to any other person at our request on trust receipt, bailee receipt or otherwise, and in and to all proceeds of the foregoing, all as security for the payment and performance of all obligations and liabilities of us or any of us hereunder. . . .

debtor [was] insolvent" at the time the repayments were made in November, 1973. 406 F.Supp. at 464–67. *See* Section 60(b) of the Bankruptcy Act, 11 U.S.C. § 96(b), note 2 *supra*; 3 Collier, Bankruptcy ¶ 60.36, at 913 (14th ed. 1975). Appellant argues that the trustee failed to meet its burden of proof, and to overcome the presumption of good faith on the part of the creditor. *See Roche v. New Hampshire National Bank,* 192 F.2d 203 (1st Cir. 1951); *Harrison v. Merchants National Bank,* 124 F.2d 871 (8th Cir. 1948). The evidence of appellant's knowledge of AIBC's insolvency, however, is quite adequate to support the district court's finding. The financial statement which the New York Bank had in its possession at the time it entered into the loan transactions in May, 1973, reflected that AIBC had a net worth of only $105,000. The New York Bank's representative in Colombia was aware in March of 1973 that two of AIBC's vice presidents, who were Colombian citizens, were claiming title to some $3 million worth of AIBC assets in Colombia. By March 27, 1973, the New York Bank was made aware by a Dun & Bradstreet report that the employment of these two vice presidents had been terminated by AIBC. To be sure, before the transactions were entered into, Silverston, the AIBC president, had told Mr. Boland, the New York Bank vice president handling the transactions, that he was proposing a settlement with the Colombian people. But the settlement agreement was never executed, a fact of which the New York Bank was aware. The Bank never even questioned AIBC regarding the matter until a credit check was made in the fall of 1973, when it turned out that AIBC's insolvency was due in part to its large losses in Colombia.

Another transaction which pushed AIBC into insolvency was similarly ignored by the New York Bank. In March of 1973, the New York Bank's correspondent bank in Colombia, Banco de la Republica, claimed that AIBC had breached a contract and

owed it damages in the amount of $600,000. As early as June of 1973 AIBC agreed to settle for $300,000 in cash and the execution of a promissory note in like amount to be paid at the end of the year. The New York Bank inquired at Banco de la Republica as to AIBC's status there, and was informed that the Colombian bank was severing relations with AIBC. In view of this situation, it borders on the incredible that appellant accepted the statement of AIBC's president, Silverston, that the problem with Banco de la Republica was "reaching settlement," without inquiring as to what the terms of settlement would be.

Other indications of financial distress at AIBC were flowing in to appellant during the fall and summer of 1973. When the Bank discovered in August that no promissory note or "advance account agreement" was ever even signed with respect to the second loan transaction with AIBC and sent a note and agreement to Silverston for execution, he failed to sign and return the documents. At the same time, AIBC was delinquent in providing financial statements to the Bank,[10] and Dun & Bradstreet reports in the New York Bank's files indicated that AIBC "declined all financial information." Despite appellant's awareness of all of this, no further investigation was made. With all of these signs pointing to possible insolvency, the New York Bank never even bothered to follow its own procedures by having its credit department approve the loan. As a result the Bank failed to ascertain that there was a $4,500,000 suit against AIBC and its Colombian affiliate as to which an attachment was entered upon AIBC's accounts at a number of the major banks in New York City, including First National City Bank, Chase Manhattan, Chemical Bank and Manufacturers Hanover Trust Company. This lawsuit had been referred to on several occasions during the fall of 1973 in the New York Law Journal. In light of all of the above, the district court was correct in finding that a person of ordinary prudence in

---

10. Even as of October, 1973, the New York Bank had been unable to obtain from AIBC a copy of its financial statement for the year ending May 31, 1973.

the position of the Bank would have made further inquiry into AIBC's affairs. The Bank is therefore chargeable with notice of all facts which a reasonably diligent investigation of AIBC would have disclosed. *Robinson v. Commercial Bank of North America,* 320 F.2d 106, 108 (2d Cir. 1963). We agree with the district court that such an investigation would properly have informed appellant of facts that "would lead a prudent business person to the conclusion that [AIBC was] insolvent." *Id.* at 107.

■ We need not discuss on this appeal the argument, advanced tentatively below but for all practical purposes abandoned here, that as to both transactions the New York Bank had a right of set-off against AIBC's account at the Bank. While a valid set-off may not be recovered as a preferential transfer under Section 60(a), *see* Section 68 of the Bankruptcy Act, 11 U.S.C. § 108; *New York County National Bank v. Massey,* 192 U.S. 138, 24 S.Ct. 199, 48 L.Ed. 380 (1904), in the case of bank accounts, this exception applies only to deposits made in good faith, in the due course of business, which are subject to withdrawal at the will of the depositor. The set-off exception does not apply where a deposit is accepted by a bank with an intent to apply it on a pre-existing claim against the depositor. *Goldstein v. Franklin Square National Bank,* 107 F.2d 393, 394 (2d Cir. 1939); 4 Collier, *supra,* ¶ 68.16, at 912–23. The Bank's internal documentation indicates that the credits made to AIBC's account on November 2 and November 19, 1973, and the subsequent debits in favor of the Bank, were on "repayment of advance" of May 3 and May 17, 1973, loans.

We pass then to the questions of law raised by the case.

*A. First Transaction—Assignment of the Time Deposit.*

■ 1. *Assignment by virtue of the April 30 and May 2, 1973, letters.*[11] The district court found, as appellant had urged, that time deposits are assignable choses in action. 406 F.Supp. at 472; *see* N.Y. General Obligations Law § 13–101 (McKinney 1964); *Myers v. Albany Savings Bank,* 270 App.Div. 466, 60 N.Y.S.2d 477 (3d dep't), *aff'd,* 296 N.Y. 562, 68 N.E.2d 866 (1946). In the case of assignment of time deposits, where perfection by public filing is not required by New York law,[12] notice need not be given by the assignee to the obligor to protect against subsequently attaching creditors of the assignor. *See County National Bank v. Inter-County Farmers Cooperative Association,* 65 Misc.2d 446, 317 N.Y.S.2d 790 (Sup.Ct.1970). Nor is delivery of the property fundamental to an assignment, as opposed to a pledge. *See generally* 3 N.Y. Jurisprudence, Assignments § 36 (1958). The New York cases make clear that an assignment need not utilize any particular phraseology or form; any act or words are sufficient which "show an intention of transferring the chose in action to the assignee, when the assignor is divested of all control and right to cause of action and the assignee is entitled to control it and receive its fruits." *Advance Trading Corp. v. Nydegger & Co.,* 127 N.Y.S.2d 800, 801 (Sup.Ct. 1953). Appellant claims that AIBC expressed such an intention (as to the first transaction) when its president, Silverston, wrote the New York Bank on April 30, 1973, stating that "We confirm to you our

11. The parties, the court below and we agree that New York law governs all questions except the effect of the Silverston instructions to Swiss Credit Bank regarding the second transaction. Judge Pollack's opinion we think quite correctly states the applicable law of conflicts of law. *See* 406 F.Supp. at 468 n.9.

12. The New York Uniform Commercial Code does not govern the transfer of a security interest in a bank deposit. N.Y. Uniform Commercial Code § 9–104(k) (McKinney 1964).

Evidently appellant does not contend on appeal as it had below that there was an assignment of the foreign exchange contract, nor could it for the reasons stated by Judge Pollack. *See* 406 F.Supp. at 475–76. Appellant failed to obtain a signed security agreement from AIBC, containing a description of the collateral. Similarly, no financing statement was filed to perfect the claimed assignment. Since the Uniform Commercial Code applies to security interests in contract rights, these omissions are fatal to appellant's claim. *See* N.Y. Uniform Commercial Code § 9–303, 302(1).

borrowing from you and lodging with you as collateral for such borrowing a Swiss Franc time deposit [located in the Luxembourg Bank]." Note 6 *supra.*

■ But to effect an assignment it is necessary "that there be a perfected transaction between the parties, intended to vest in the assignee a present right in the things assigned." *See Coastal Commercial Corp. v. Samuel Kosoff & Sons, Inc.,* 10 App. Div.2d 372, 376, 199 N.Y.S.2d 852, 855 (4th Dep't 1960). An assignment at law contemplates "a completed transfer of the entire interest of the assignor in the particular subject of assignment, whereby the assignor is divested of all control over the thing assigned." *Id.* Thus a mere agreement to pay a debt out of a designated fund "does not operate as a legal or equitable assignment since the assignor retains control over the subject matter." *See Modern Kitchens of Syracuse, Inc. v. Damiano,* 51 Misc.2d 264, 265, 273 N.Y.S.2d 151, 153 (Sup.Ct. 1966), *quoting Donovan v. Middlebrook,* 95 App.Div. 365, 367, 88 N.Y.S. 607, 608 (1st Dep't 1904). An assignment cannot exist where an assignor retains control over the fund or any authority to collect or any power to revoke. *Farmers' Loan & Trust Co. v. Winthrop,* 207 App.Div. 356, 362, 202 N.Y.S. 456, 462 (1st Dep't 1923), *modified,* 238 N.Y. 477, 144 N.E. 686 (1924), *cert. denied,* 266 U.S. 633, 45 S.Ct. 225, 69 L.Ed. 479 (1925); *In re Knowlton's Will,* 208 Misc. 454, 464, 143 N.Y.S.2d 111, 120 (Sur. Ct. Kings Cty. 1955).

■ The trial court found that AIBC retained control over the funds or had a power to revoke its instructions concerning the transfer of the funds, and that the creation of a valid assignment under New York law was therefore precluded. *See Maloney v. John Hancock Mutual Life Insurance Co.,* 271 F.2d 609, 614 (2d Cir. 1959), and New York cases cited *supra.* Appellant urges that the letters exchanged between AIBC and appellant on April 30 and May 2, 1973, note 6 *supra,* indicate AIBC's intent irrevocably to commit the time deposit to the

control of the New York Bank. However, these letters do not constitute a divestment of all right, title and control by AIBC. AIBC's letter of April 30 asks the New York Bank "to instruct Wells Fargo Luxembourg for us to deliver this sum through Zurich to Swiss Credit Bank Zurich in favor of American IBC Corp. . . ." The May 2 letter in reply conforms to the Silverston proposal by saying: "As requested in your letter of April 30th, we have requested Wells Fargo Bank Luxembourg to pay through Swiss Bank Corp. Zurich. . . ." This was followed by a quotation of the Telex instructing the Luxembourg Bank to pay the proceeds of the time deposit account at maturity to Swiss Credit and to indicate in their remittance that the sum of money is to be credited "to WFBI for account American IBC attention Boland." Thus it is AIBC, not the New York Bank, which issued instructions regarding transmission of the proceeds of the Wells Fargo Luxembourg time deposit account. For all intents and purposes it appears that the New York Bank was acting only at the behest of AIBC in this matter. Indeed, if the instructions underlying the second transaction were revocable (as appellant in effect concedes by its argument that AIBC had legally revoked similar initial instructions on the second transaction), these instructions were equally so. We agree with Judge Pollack that "[t]his sequence of revocable instructions may be taken at most to designate the fund out of which AIBC planned to repay the New York Bank, but such a designation does not constitute an assignment of the fund." 406 F.Supp. at 475, *citing Donovan v. Middlebrook, supra.*

■ Appellant, however, argues that the district court failed to recognize that a valid assignment in collateral may be for security purposes only, with present title remaining in the assignor. *See Maloney v. John Hancock Mutual Life Insurance Co., supra,* 271 F.2d at 614; *Griffey v. New York Central Insurance Co.,* 100 N.Y. 417, 422, 3 N.E. 309, 311 (1885).[13] The leading

13. Needless to say, the argument that in some way there was a present security interest in the

time deposit tends to conflict with the underlying bankruptcy act policy against secret liens

case cited by appellant for this proposition, *Maloney v. John Hancock Mutual Life Insurance Co., supra,* does not support its position in this case. In *Maloney,* this court reiterated that an effective assignment under New York law "necessitates such a present transfer of title or dominion that the debtor can safely pay the fund to the assignee notwithstanding any protests or orders to the contrary by the assignor." 271 F.2d at 614. The exception which permits the assignor to retain title in the collateral while giving a security interest to the assignee arises in the narrow situation where a "present assignment [is] a transfer[,] by way of security for a loan[,] of claims to become payable in the future, when the transfer is conditioned upon the assignor's default in repayment of the loan." *Id.* Thus, the essential feature of a valid "conditional assignment for purposes of security" is that title to the collateral (*e.g.,* an insurance policy) is retained by the assignor subject to his performance of an *independent* obligation owed to the assignee. The situation thus described is one where the debtor has the alternatives of (1) performing the condition and retaining the collateral or (2) not performing the condition and forfeiting the collateral. Neither of these situations is possible in the present case where the "collateral security" claimed is the proceeds of the loan itself:

(1) if AIBC performed the condition of repayment, it was to be by transferring the collateral to appellant;

(2) AIBC could not refuse to perform the condition by retaining the time deposit because, appellant claims, forfeit of the condition would transfer title to the time deposit to the Bank.

This anomalous situation suggests how inapplicable the doctrine of "conditional assignment" is to the present case. The effect of applying that doctrine here would be to allow the creditor to obtain the same, complete rights over the collateral through

a "conditional assignment" that he would have obtained by proper execution of an unconditional "present transfer of title or dominion" by way of actual assignment of the property. Not surprisingly, appellant has cited no cases to us which have stretched the doctrine of conditional assignment to this anomalous situation.

Furthermore, the facts in this case suggest that no such "conditional title" to these funds had actually vested in the Bank. The Bank did not attempt to protect its claimed conditional interest by restricting AIBC's access to the funds at maturity. Instead, AIBC was fully in control of the disposition of the time deposit proceeds. The instructions from AIBC to the Luxembourg Bank directed the latter to make payment of the proceeds of the time deposit account at maturity to the Swiss Bank, rather than the New York Bank. The Swiss Bank, in turn, received all of its instructions regarding these funds from AIBC. It is apparent from the second transaction that AIBC retained authority over the eventual disposition of the dollars obtained from the exchange contract. It ordered Swiss Credit to apply the dollars to AIBC's account at the Swiss Bank, rather than transmit the funds to its account at the New York Bank—instructions that Swiss Credit states it would have complied with but for a clerical "mistake." As to the first transaction, AIBC ordered Swiss Credit to transfer the proceeds of the currency exchange to AIBC's account at the New York Bank. It is instructive that in actual fact that is exactly what occurred. When the funds were transmitted to the New York Bank from Swiss Credit on November 2, 1973, the New York Bank credited AIBC's account with the full amount received, and then debited the account for the principal and interest due on the May 3 loan; it did not take the payment directly for itself and credit AIBC's account only with the excess over the amount owed to the Bank.[14]

expressed in Section 60(a)(2), 11 U.S.C. § 96(a)(2). *See* 3 Collier, Bankruptcy ¶ 60.38, at 941 (14th ed. 1975).

**14.** Appellant refers to *McKenzie v. Irving Trust Co.,* 292 N.Y. 347, 55 N.E.2d 192, *aff'd,* 323 U.S.

365, 65 S.Ct. 405, 89 L.Ed. 305 (1945), as holding that it is immaterial that the funds were credited to the account of AIBC which was then debited in the amount of principal and interest due the bank. However, in *McKenzie* where a debtor had mailed a check to a credi-

This situation is quite different from that observed in all other instances under New York law where the creditor has obtained a conditional assignment in collateral to secure performance of an independent obligation. In each of those cases, the assignee was careful to protect its conditional claim either by notifying the bailee of the collateral of the assignee's interest or by taking possession of the collateral itself. *E. g., Maloney v. John Hancock Mutual Life Insurance Co., supra* (conditional assignment of life insurance policy to secure payment of a personal services contract; assignee notified insurance company); *Malone v. Bolstein,* 151 F.Supp. 544 (N.D.N.Y.) (conditional assignment of accounts payable; account debtor notified by knowledge of its officers and directors), *aff'd per curiam,* 244 F.2d 954 (2d Cir. 1957); *Griffey v. New York Central Insurance Co., supra,* (conditional assignment of insurance policies to secure payment on a loan; insurance policies held by assignee); *Senese v. Senese,* 121 N.Y.S.2d 498 (Sup.Ct.1953) (conditional assignment of insurance policies to secure a loan; insurance company notified by assignee); *Frensdorf v. Stumpf,* 30 N.Y.S.2d 211 (Sup.Ct.1941) (mortgage pledged to secure a loan; mortgage delivered to assignee). *Cf. National Nassau Bank v. Cleary,* 171 App.Div. 540, 157 N.Y.S. 696 (1st Dep't 1916) ("assignment as security" of mortgage was a pledge). The absence of efforts by the New York Bank to notify the other banks involved in the AIBC transaction of its claimed conditional title distinguishes this case from the cases just cited. In conjunction with the absence of authority for application of the conditional assignment theory in this situation where the collateral is itself the subject of the debt, we conclude that the facts belie the claim that appellant retained conditional title to the Luxembourg time deposit. The record

is clear that the Bank was relying on the business integrity of AIBC, and not on an informed chain of bailees, to secure return of the time deposit proceeds from the European banks. In view of our conclusion that the Bank did not obtain conditional title in the time deposit, we need not decide whether such title, had it existed, would have survived the termination of that deposit, the exchange of the proceeds for dollars in Switzerland, and the subsequent transmission of those dollars into AIBC's New York Bank account.[15]

 2. *Assignment pursuant to the 1970 General Pledge Agreement.* In 1970, AIBC signed a General Pledge Agreement (note 7 *supra* ) whereby it assigned to the New York Bank "all money and property [of AIBC] . . . which shall hereafter be delivered to or come into the possession, custody or control of [the] Bank." The Bank claims that when AIBC deposited the Swiss Francs at the Luxembourg Bank, the deposit automatically became subject to the terms of the Agreement as "money . . . [in] the possession, custody or control of [the] Bank." Assuming arguendo that possession of the Swiss Francs by the Luxembourg Bank, appellant's affiliate, was tantamount to possession by the New York Bank, the claim that AIBC assigned these funds to the appellant must still fail. The reason for this is quite simple. Money deposited in a general account at a bank does not remain the property of the depositor. Upon deposit of funds at a bank, the money deposited becomes the property of the depositary bank; the property of the depositor is the indebtedness of the bank to it, a mere chose in action. *Sundail Construction Co. v. Liberty Bank,* 277 N.Y. 137, 13 N.E.2d 745 (1938); *In re Delaney,* 256 N.Y. 315, 176 N.E. 407 (1931); 3 Michie on Banks and Banking Ch. 6, § 181, at 386–97 (rev.ed. 1974). Accordingly, when AIBC deposited

---

tor bank more than four months before his bankruptcy petition but the bank credited the funds to the debtor's account and debited the account thereafter, so repayment of the loan was not made until after the check was received within the four-month period, the sole

question was whether the transfer was deemed to have occurred when the bankrupt mailed the check or when it was received. 292 N.Y. at 359, 55 N.E.2d at 197.

**15.** *See* note 13 *supra.*

the Swiss Francs with the Luxembourg Bank, AIBC had no assignable property interest in the "money . . . [in] the possession . . . of [the] Bank."

Appellant argues that AIBC retained a property right in the Swiss Francs deposited at the Luxembourg Bank because they constituted a "special deposit." Whereas a "general deposit" consists of delivery of money into the possession of a bank, whose property the deposit becomes, a "special deposit" is a deposit delivered into the possession of the bank to be held separate and distinct from the general assets of the bank and to be returned or delivered intact on demand, the title thereto remaining in the depositor. *Pattison v. Syracuse National Bank,* 80 N.Y. 82 (1880). The relationship of the depositor and the bank in the case of a special deposit is not that of creditor and debtor, but of bailor and bailee.

The evidence is quite clear, however, that the Swiss Francs deposited in the Luxembourg Bank were not held separately as a "special deposit." Appellant's own executive vice president, Mr. Lilien, testified that the Swiss Francs became "the general funds [of the Luxembourg Bank] when they [were] received by the bank. They belong[ed] to the bank." He further stated that the Swiss Francs were not kept in the same form, and were used for the same general purposes the bank would normally apply deposited funds. Thus, appellant's own evidence convincingly reveals that AIBC held no assignable title to the Swiss Francs on deposit in Luxembourg. The only property interest held by AIBC after its deposit of the Swiss Francs was the time deposit account, an intangible chose in action, which, as we have held above, AIBC did not validly assign to the New York Bank.

B. *First Transaction—Pledge of the Time Deposit.*

Appellant's last claim with regard to this first transaction is that it had perfected a valid pledge of the AIBC time deposit in the Luxembourg Bank under the 1970 General Pledge Agreement and the New York common law.[16] It is clear, of course, that a loan may be secured through a possessory security interest such as a pledge. *See McCoy v. American Express Co.,* 253 N.Y. 477, 171 N.E. 749 (1930). The elements of a pledge include an intention to pledge collateral security and possession of the collateral by the pledgee or by a third person acting on the pledgee's behalf for the purposes of securing a debt. Restatement of Security, §§ 5, 8 (1941). It is sufficient that there be notification of the pledge to the third person in possession of the chattel intended to be pledged. *Id.* § 8, comment *b.* *See* 53 N.Y. Jurisprudence, *supra,* Secured Transactions § 39, at 274. To effect a valid pledge of an intangible asset, such as a time deposit, the pledgee, or his agent, must possess formal written evidence of an interest in the intangible which so represents the intangible that the enjoyment, transfer or enforcement of the intangible depends upon possession of the instrument. Restatement of Security, *supra,* § 1, comment *e.* A valid pledge of such an "indispensable instrument" creates an interest not only in the instrument but in the intangible represented by it. *Id.* § 2(3). However, where the instrument delivered to the putative pledgee is not indispensable to the transfer or enforcement of the intangible, the interest obtained cannot be a pledge. *Id.* § 1, comment *e.*

While the district court held that the April 30 and May 2, 1973, correspondence between AIBC and appellant indicate a clear intention to pledge the Swiss Franc time deposit to the New York Bank, *see* note 6 *supra,* it concluded that the "issuance by the Luxembourg bank to AIBC of a clean receipt for the time deposit, and the failure of the New York bank to have the receipt recalled or modified to reflect its pledge, are . . . fatal to the [appellant] Bank's pledge claim." 406 F.Supp. at

**16.** *See* note 12 *supra.*

468–69.[17] Since a valid pledge could be created only by way of delivery of an indispensable instrument pertaining to the bank account itself, Restatement of Security, *supra*, § 1, comment *e*; G. Gilmore, Security Interests in Personal Property § 7.1 (1965); 21 Harv.L.Rev. 61, 61–62 (1907), and because there was no such delivery of any indispensable instrument to the New York Bank, the district court held that the claim of pledge must fail.

It is, of course, far from certain whether AIBC's time deposit in the Wells Fargo Luxembourg was like the ordinary savings deposit account where a passbook is issued, its delivery constituting a valid pledge. *See In re Hoffman's Estate*, 175 Misc. 607, 25 N.Y.S.2d 339 (Sur.Ct.1940); *Grant v. Colonial Bank and Trust Co.*, 356 Mass. 392, 252 N.E.2d 339, 342 (1969). The New York Bank argues that its Telex key and key code constituted the "indispensable instrument" equivalent to a passbook or certificate of deposit in reference to the Luxembourg time deposit.[18] Appellant's argument is that it would be impractical in international banking transactions if methods of depositing and obtaining funds depended on the presentation of an instrument such as a passbook or a certificate of deposit because depositors do not have the time to travel thousands of miles to deposit or withdraw funds located at various banks scattered across the globe. For this reason, appellant argues, banks in international transactions have adopted more convenient systems for the deposit and withdrawal of funds. In this case the depositor, instead of receiving a passbook from the depository bank, is given an everchanging "test key" verifying code number which allows the user to deposit and withdraw funds from his account via Telex even though he is thousands of miles away. The New York Bank contends that its test key number, of which it has exclusive knowledge, serves the same purpose and function in international transactions as the traditional "indispensable instrument" does in everyday banking transactions. Because AIBC deposited funds with the Luxembourg affiliate through the use of the New York Bank Telex, and no test key code number was given to AIBC by the New York Bank, appellant claims it retained exclusive control over the deposit or withdrawal of funds from the time deposit account. A witness for the bank testified that AIBC could have sent Telexes or letters to the Luxembourg affiliate, but without the test key code such

17. What actually was issued by Wells Fargo Luxembourg was Exhibit 3, which is reproduced as Appendix A hereto.

18. This is a novel contention. Appellant argues that there has never been a "test case" involving "the test key code" because it has worked so well and is so safe and reliable. Appellant also argues that the Telex key code was an "indispensable instrument" under comment *e* to the Restatement of Security § 1 (1941) which reads:

> *e. Indispensable instrument.* An indispensable instrument as used in the Restatement of this Subject means the formal written evidence of an interest in intangibles, so representing the intangible that the enjoyment, transfer or enforcement of the intangible depends upon possession of the instrument. If the instrument cannot be produced, the interest which it represents can be effectively asserted only by accounting for the absence of the instrument and obtaining as a substitute for it, either a duplicate or some form of court decree. Indispensable instruments include not only negotiable instruments such as promissory notes and bills of exchange, but also share certificates, bonds, interim certificates, savings bank books and insurance policies. Where the instrument is not an indispensable one, for example, a written assignment of a list of book accounts as security, the interest obtained by the assignee in the accounts is not a pledge.

See also Comment on Section 2(3):

> Where the instrument is an indispensable one but not negotiable, the delivery of the instrument, if made for the purpose of creating a pledge, transfers to the pledgee the pledgor's interest in the intangible represented by the instrument, subject to the pledgor's power to redeem. Where the instrument is not an indispensable one, the delivery may be evidence of an intent to make an assignment of the intangible, but the bailment alone creates an interest in the thing delivered rather than in the intangible represented by it. In the Restatement of this Subject, if an interest is created in an intangible, not represented by an indispensable instrument, it is considered a security assignment rather than a pledge.

Telexes would not have affected the disposition of the funds. Therefore, appellant claims, the indispensable instrument in connection with the Luxembourg time deposit was solely the Telex key and Telex key code, not the receipt or contract that was issued to AIBC by Wells Fargo Luxembourg, see note 17 supra. Appellant differentiates time deposit receipts from certificates of deposit, and claims that under the controlling New York law creditors are not entitled to rely on a bank deposit receipt as evidence of ownership of a deposit. See First National Bank v. Clark, 134 N.Y. 368, 372, 32 N.E. 38, 39–40 (1892).

The district court rejected this argument on the basis that the appellant's purported control over disposition of the time deposit account was belied by the documentary evidence. The record includes two examples of mail communication from the Luxembourg Bank to AIBC, including a request for confirmation of receipt of the time deposit contract. But as appellant points out, the mail communication in question did not involve the disposition of the funds. It was simply a request for confirmation of the time deposit receipt. The question is not whether AIBC could communicate with the Luxembourg affiliate by other means, but whether by such communication it could have effected the enjoyment, transfer or enforcement of the deposit without use of the Telex key code. While the trial court's findings are not as clear as we would perhaps wish in this respect, the burden was on the appellant to establish that it was secured by pledge and, specifically, to establish that the Telex test key code gave it irrevocable authority over AIBC's account in Luxembourg.

■■■■ This it did not do. The time deposit account was in the name of AIBC. No instrument indicating the pledge interest of the New York Bank was issued. There is nothing in the record to show that AIBC's contract of deposit was itself insufficient to withdraw the funds or that AIBC could not have obtained access to its time deposit through other documentation, such as duly authenticated signature cards, so as to obviate any need for the bank's Telex test key number. As the district court held, the appellant conducted this transaction in a manner that permitted the bankrupt to make it appear to potential creditors that the Swiss Franc time deposit at Luxembourg was an unencumbered asset. 406 F.Supp. at 471. The primary purpose of the requirement of delivery of the pledged property is to provide notice to creditors that the property in question is no longer free from prior interests of third parties. Gins v. Mauser Plumbing Supply Co., 148 F.2d 974, 977 (2d Cir. 1945); In re Copeland, 391 F.Supp. 134, 151 (D.Del.1975). The Telex key code did not serve this function; nor did it, on the proof presented below, constitute the requisite "indispensable instrument." It is unnecessary for us to determine whether the time deposit contract, or any other documentation received by AIBC, was an indispensable instrument, transfer of which would have constituted the pledge; AIBC did not deliver any such document to the New York Bank. In sum, we agree with Judge Pollack that appellant has failed to show that its interest in the Luxembourg deposits was secured by a pledge. The further conclusion of the district court, that "the assumed pledge was lost as [a] matter of law when the Swiss Francs were forwarded to the Swiss Bank without any notice of a pledge to the New York Bank," 406 F.Supp. at 471, is therefore not necessary to the disposition of this case on appeal.

C. *The Second Transaction.*

■■■■ The only contention made by appellant in respect to the second transaction is that the transfer of funds between the Swiss Bank and the New York Bank on November 19, 1973, was not a preferential transfer because the repayment dollars were not the "property" of AIBC. See note 5 supra. Appellant urges that as a result of an exchange of communications between Swiss Credit, United California and AIBC, the dollars transferred to the New York Bank were the property of Swiss Credit. This argument is based upon AIBC's "irrev-

ocable" instructions to United California[19] to pay the matured time deposit to Swiss Credit Bank on November 19, 1973, and the Telex message from Silverston to Swiss Credit, dated August 29, 1973, which *inter alia* requested Swiss Credit, to "kindly utilize these dollars to repay all dollar advances (and interest thereon) made to American IBC Corp. [by Swiss Credit Bank]." It is claimed that the effect of these instructions was to assign the time deposit proceeds to Swiss Credit as of August 29, 1973, more than four months prior to the filing of appellee's petition in bankruptcy, thereby giving Swiss Credit full ownership of the funds upon receipt of them on November 19, 1973.

The parties do not now dispute that Swiss law governs on this point since Switzerland is the jurisdiction whose contacts with the transaction were the most numerous. *See* 406 F.Supp. at 482. As the district court found, under Swiss law the August 29 Telex could not constitute a transfer, assignment or conveyance of AIBC's interest in the U.S. dollar proceeds. Swiss law requires that a valid assignment be executed, that is to say, signed by the assignor. While it is at least arguable that AIBC's Telex test key code would satisfy the signature requirement under UCC § 1-201(39), the parties do not here contest the district court's ruling that the test key code is inadequate for a signature under Swiss law. The district court also held that the AIBC August 29 Telex does not constitute an assignment under Swiss law because it does not sufficiently reflect an intention on the part of AIBC to relinquish and divest itself of ownership and title to the dollar proceeds of the time deposit. 406 F.Supp. at 482. The instructions—"kindly utilize" the time deposit proceeds upon receipt—fall short of

an outright, present relinquishment of all rights over these funds.

While the August 29 Telex may not have constituted an assignment, it may have given the Swiss Bank a lien on the funds. But the lien at most entitled Swiss Credit to appropriate the time deposit proceeds for itself by exercising a right of set-off against the account AIBC maintained with Swiss Credit. This "lien" was plainly defeasible by an attaching creditor prior to Swiss Credit's receipt of the funds from United California. Since Swiss Credit's interest became indefeasible only on November 19, 1973, if at all, its retention of the funds at that time, within four months of bankruptcy could itself have constituted a voidable preference were it within the jurisdiction of the bankruptcy court.[20] But more importantly, whatever lien or interest the Swiss Bank may have had was relinquished when it neglected to exercise its right of set-off and instead remitted the dollar proceeds to the New York Bank for the account of AIBC. Accordingly, as of November 19, 1973, the funds transferred from Swiss Credit to the New York Bank were still the property of AIBC.

■ Appellant argues alternatively that since the time deposit proceeds were subject to a valid lien by Swiss Credit as of August 29, 1973, and since the New York Bank itself held a lien (set-off) on the proceeds upon their receipt on November 19, 1973, the dollars were never the "property of the debtor" within the four-month period preceding the filing in bankruptcy. If this were so, it is claimed, then the payment to the New York Bank would not be a preference because it would not constitute a diminution of AIBC's assets. *See In re Erie Forge & Steel Corp.,* 456 F.2d 801 (3d Cir.

---

**19.** In July, 1973, AIBC president Silverston issued "irrevocable" instructions to United California, directing it to transfer the time deposit proceeds at maturity to Swiss Credit. "Irrevocable" instructions, labeled as such by the depositor and treated as such by the bank, are used to provide assurance of commitment in international commercial transactions.

**20.** The exception from the preferential transfer rules of Section 60(a) for "set-offs" would not apply, of course, because the deposit was not made in the due course of business, subject to withdrawal at the will of the depositor, but was made with an intent to apply it on a pre-existing claim against the depositor. *See Goldstein v. Franklin Nat'l Bank,* 107 F.2d 393, 394 (2d Cir. 1939).

1972); *Ricotta v. Burns Coal & Building Supply Co.,* 264 F.2d 749 (2d Cir. 1959).

But in *In re Erie Forge & Steel Corp.,* the bank in the equivalent situation of the Swiss Credit Bank had validly offset the amount outstanding on its loan against the balance in the debtor's general checking account. When the bank subsequently paid a smaller sum to another bank in connection with the same loan, the payment to that other bank did not amount to a transfer of the debtor's property. There was not even any indication there that the funds paid to the second bank were generated by the debit to the debtor's general account. The transaction in this case differs in each material respect: Swiss Credit did not enforce a valid lien against the fund; the amount transferred to the New York Bank was identical to the amount of the debtor's property subject to the Swiss Bank's disposition; the source of the amount transferred was plainly AIBC's account, not Swiss Credit's general funds.

In one sense, *Ricotta* is stronger for appellant. It holds that where a material man could have filed liens for building materials furnished the bankrupt and the filing or enforcement of the lien would not have constituted a preference, the court would treat payments for the debts as if liens had been filed. But as Chief Judge Clark's opinion in *Ricotta* makes clear, that case involved the filing of liens under Section 67b of the Bankruptcy Act, 11 U.S.C. § 107(b). That section expressly provides that mechanic's liens and certain other statutory liens "may be valid against the trustee, even though arising or perfected while the debtor is insolvent and within four months prior to the filing of the petition . . .." *Id.* In other words, certain special liens, as in *Ricotta,* have been singled out for favorable treatment as exceptions to the rules relating to preferences. Banks' liens are not similarly favored under the statute. The Bank's failure to perfect any of the interests claimed on this appeal more than four months before the filing of the debtor's petition in bankruptcy results in our conclusion that the two payments received by the Bank from AIBC, via Swiss Credit, in November, 1973, were preferential transfers under Section 60(a) of the Bankruptcy Act.

The judgment of the district court is affirmed.

APPENDIX A