LESTER J. GRANT & others[1] *vs.* COLONIAL BANK AND TRUST COMPANY.

Suffolk.    October 10, 1969. — November 4, 1969.

Present: WILKINS, C.J., CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Savings Bank. Security Interest. Pledge. Bank and Banking. Set-off.*

Where it appeared that one indebted to trustees delivered to an escrow agent a savings account book to be held as security for payment of the indebtedness, that subsequently a substitution of collateral, intended to continue the escrow agent's interest unchanged, was effected by withdrawal of the entire amount on deposit in the account, by deposit thereof in a second bank which issued a new savings account book to the debtor, and by delivery of the new book, with a signed withdrawal order for the full amount, by the debtor to the escrow agent, that the second bank participated in such substitution for its benefit with knowledge of the original arrangement with the escrow agent, and that after the substitution the second bank purported to apply by set-off the amount on deposit in the new account to payment of a note of the debtor to the second bank providing that the second bank might so apply the deposit if it should "deem itself insecure," it was held that the escrow agent had a pledgee's and security interest

<hr>

[1] The trustees of the Burnam Realty Trust; Mr. Arthur Gilman, attorney for the trustees; and Barry D. Hoffman, who with Grant was a guarantor of certain notes, mentioned in the opinion, given by Richard E. Kent.

in the new book and the amount on deposit represented thereby and that the second bank in the circumstances had no right to make the attempted set-off but must pay such amount to the escrow agent on his demand.

BILL IN EQUITY filed in the Superior Court on March 21, 1967.

The suit was heard by *Brogna,* J.

*David C. Hawkins* for the defendant.

*Julius L. Shack* for the plaintiffs.

CUTTER, J. The plaintiffs seek declaratory relief concerning a savings bank account (account no. 1690) issued by Colonial Bank and Trust Company (Colonial).[2] The trial judge made findings, adopted by him as a report of material facts, and determined ownership of the funds in account no. 1690. The final decree made a declaration of rights and gave Colonial directions concerning payment of the funds in the account. Colonial appealed. The evidence is reported. Except as otherwise noted, the facts are stated in accordance with the judge's findings, which are justified by the evidence.

The trustees of Burnam Realty Trust (Burnam Trust) held three notes made by Kent (see fn. 1), each secured by a first mortgage on real estate and each guaranteed by Grant and Hoffman. On January 4, 1966, to permit Kent to sell the mortgaged real estate, these persons made an agreement (the January 4 agreement) with the law partnership of McLaughlin Brothers and others. The McLaughlin firm (the escrow agent) was to serve essentially as escrow agent for Burnam Trust to hold, as security for the payment of the notes from Kent to Burnam Trust, certain property of Kent, with the right to substitute collateral. Accordingly, Kent delivered on January 6, 1966, to Mr. Gilman, a partner in the firm serving as escrow agent, two savings account books, each for $10,000, to be held as such security. One of the accounts (the Winter Hill account) was in the Winter Hill Federal Savings and Loan Association.

---

[2] During some of the transactions, Colonial was known as Athol Bank and Trust Company. In this opinion, under both names, it is referred to as Colonial.

In March, 1966, Kent and Barry D. Coltin, president of Colonial, had a conversation in which Coltin requested Kent to deposit more funds with Colonial. Kent had been borrowing from Colonial on unsecured notes since 1964. Kent told Coltin that he had the two savings account books held under the January 4 agreement, that they were held as security for Kent's notes, and that he had the right to substitute collateral. Mr. Gilman, in behalf of the escrow agent, agreed to accept a savings account book with Colonial as a substitute for the Winter Hill account. The testimony shows that the substitution was on the condition that Kent first produce the new savings account book as collateral before the old book would be released and the amount in it could be withdrawn from the Winter Hill account for deposit with Colonial.

A savings account book for account no. 1690 was issued by Colonial in Kent's name showing a deposit on April 1, 1966, of $10,000. On April 4, 1966, Kent delivered this to Mr. Gilman of the McLaughlin firm, with a withdrawal order for the whole amount in the account signed by Kent and witnessed by Eric Starr. Starr, so the testimony shows, worked for William Coltin & Company, with which Barry Coltin, brother of William, had his office. Starr accompanied Kent to Mr. Gilman's office. At the time the book for account no. 1690 was delivered to Mr. Gilman, no funds in fact had been deposited with Colonial in the account. Kent and Starr received from Mr. Gilman the book for the Winter Hill account and withdrew the whole amount. The evidence shows that this was done by a check to Kent, indorsed by him for deposit, then delivered to William Coltin, and deposited with Colonial. An actual deposit with Colonial thus was effected. Cf. *Brogna* v. *Commissioner of Banks*, 248 Mass. 241, 243–244.

In February, 1966, Kent owed Colonial more than $15,000, partly at least on unsecured notes. On February 7, Colonial informed Kent that his unsecured line of credit for the ensuing year was to be $10,000. On March 1, Kent's request for a short term loan of $5,000 was refused by Colonial,

although the testimony shows that other loans were later made to him. On August 7, Kent gave to Colonial a note for $10,000, payable in sixty days. It contained the provision set out in the margin.[3] This was a renewal of a prior note or notes. In October, 1966, Colonial "deemed itself insecure" because Kent had not met payments "on two automobiles financed by the bank."

On October 11, 1966, Mr. Gilman informed Colonial by letter that he was holding account no. 1690 as security for Kent's indebtedness to Burnam Trust, on which Kent was then in default. On October 14, Mr. Gilman sent the book for account no. 1690 with the withdrawal slip to Colonial and asked for a check for the full amount with accumulated interest. On October 17, Colonial wrote to Mr. Gilman that it had applied the funds in account no. 1690, to Kent's indebtedness to the bank. The trial judge found that this had been done because of Colonial's receipt of Mr. Gilman's letter of October 11.

The trial judge also found that Barry Coltin had actual knowledge of the January 4 agreement and that neither Mr. Gilman nor the trustees of Burnam Trust had any knowledge of the provisions of Kent's note to Colonial. He ruled (1) that "whatever security interest was created by . . . the note, it was subject to the prior rights of the" plaintiffs of which Colonial, "through its president, had actual knowledge," and (2) that the possession by Mr. Gilman of the book for account no. 1690 "created an interest in the intangible represented by the book." In the final decree, it was declared that Colonial "had no right to appropriate" account no. 1690 to pay Kent's note to it. Colonial was ordered to pay to Mr. Gilman the full amount of the account with interest.

---

[3] "The undersigned and any and all endorsers agree that at any time, if the Colonial Bank and Trust Company shall deem itself insecure by reason of any change in the financial condition or credit responsibility of the maker of this note, it shall have the right forthwith, without notice, to declare this note due and payable, and any moneys of the undersigned and of any endorser, on deposit with said Bank may be appropriated and applied on this note at any time before or after its maturity and without demand upon or notice to anyone."

1. The assignment of the Winter Hill account gave to the escrow agent a security interest in that account. See *Rix* v. *Dooley,* 322 Mass. 303, 308. The escrow agent had at least a pledgee's interest and an equitable title in the bankbook and in the sum deposited in the bank.[4] The evidence and findings clearly establish that substitution as collateral of account no. 1690 for the Winter Hill account was intended "to make no change in . . . [the escrow agent's] security." Cf. *Piea Realty Co. Inc.* v. *Papuzynski,* 342 Mass. 240, 248. Colonial issued the book representing account no. 1690 in circumstances clearly charging it with knowledge (through its president and a director) of the escrow agent's security interest in it, in substitution for the Winter Hill account, and the intention of all concerned was to continue that interest.

2. A savings account book has special status as a security in Massachusetts. "It is well settled that a gift, pledge, or sale of a bank book, with or without a technical assignment of the debt evidenced thereby, vests a title not only in the book, but in the amount in the bank, which is enforceable in equity and that for the purposes of taxation the book is a security . . . . [L]ike a bill of exchange or note, it is for many purposes a chattel . . . and is not merely an evidence of debt but is representative of it." See *Stebbins* v. *North Adams Trust Co.* 243 Mass. 69, 75–76, and cases cited.[5]

Such a bankbook, of either a Massachusetts savings bank or a Massachusetts company, has been recognized by statute as appropriate collateral for loans by Massachusetts savings banks. See G. L. c. 168, § 38, par. 3 (as amended through St. 1962, c. 169, § 6).[6] This provision constitutes legislative recognition of a savings account book as so embodying the

---

[4] See Restatement: Security, § 1(e), which describes a savings bankbook as an "indispensable" instrument "so representing the intangible [account] that the enjoyment, transfer or enforcement of the intangible depends upon" its possession or requires accounting for its absence.

[5] See also G. L. c. 106, § 9–104 (k), and Uniform Commercial Code (1962 Official Text), same section, comment 7, p. 621 (which mentions that "[r]ights under . . . deposit accounts are often put up as collateral"); annotation, 53 A. L. R. 2d 1396, 1406.

[6] See later amendment by St. 1969, c. 321.

account, an intangible property interest, as to permit a pledge of the book to create a security interest in the account.[7]

There is no language, even in fine print (cf. *Hunt* v. *Perkins Mach. Co. Inc.* 352 Mass. 535, 538–541), in the bankbook issued by Colonial indicating any express reservation by the issuing bank of any right to appropriate the funds in the account by set-off to pay a loan by the bank to the depositor named in the account or listed on the bank's records as its owner. Indeed, one of the rules and regulations of Colonial's savings department printed in the books provides, "2. No payment will be made without this book." See *Stebbins* v. *North Adams Trust Co.* 243 Mass. 69, 75. Thus no explicit term of the contract between Colonial and Kent tends to restrict Kent's power to transfer a security interest in the account by a pledge of the bankbook and the delivery of an executed withdrawal order.

3. Whether a savings bank possesses a right of set-off of amounts on deposit with it in payment of the depositor's indebtedness to it was expressly left undecided in *Forastiere* v. *Springfield Inst. for Sav.* 303 Mass. 101, 105.[8] There it was recognized not only that a savings bankbook "falls short of being a negotiable instrument" but also that such a book is "more than mere evidence of indebtedness and has many of the qualities of a chattel constituting the key to the deposit." It was stated that a savings deposit "in

---

[7] The statute just cited makes no distinction between a savings account book issued by a Massachusetts savings bank and one issued by a Massachusetts trust company. We perceive no such difference in respects now pertinent, with respect to transactions affecting savings account passbooks. We think that no such differentiation was intended by the elimination of G. L. c. 172, § 60 (as amended through St. 1959, c. 176, § 1), by the general revision of the trust company law (c. 172) in St. 1961, c. 493, § 1. See now c. 172, § 51 (as amended through St. 1964, c. 279). See later amendment by St. 1969, c. 337, § 3.

[8] See as to authority elsewhere bearing to some extent on this unresolved issue, *McCaskill* v. *Connecticut Sav. Bank,* 60 Conn. 300, 311 (issuance of savings bankbook procured by fraud); *People* v. *Roseland State Sav. Bank,* 282 Ill. App. 289, 294–295; *Pursiful* v. *First State Bank,* 251 Ky. 498, 501; *Hopkins Place Sav. Bank* v. *Holzer,* 175 Md. 481, 488; *Handle* v. *Real Estate-Land Title & Trust Co.* 316 Pa. 116, 118–120; *Marlowe* v. *First State Bank,* 52 Tenn. App. 99; Michie, Banks and Banking (Perm. ed.) c. 16, §§ 21, 28. See also *United States* v. *Butterworth-Judson Corp.* 267 U. S. 387, 394–395.

some respects is an interest in a trust fund rather than an absolute debt."

It is not necessary even now to decide completely the question left unresolved in the *Forastiere* case, and we do not do so. It is decisive of this case that Colonial, through its president, knew of the security interest of the escrow agent at the creation of account no. 1690 and, indeed, directly participated (for its own benefit in increasing its deposits) in substituting account no. 1690 for the Winter Hill account in which the escrow agent had a security interest. Because Colonial knew on April 4, 1966 (when the book for account no. 1690 was delivered to the escrow agent), of the equitable security interest of the escrow agent, it in October, 1966, could not appropriate by set-off the funds in the account as wholly the property of Kent for the payment of a debt not shown to have matured and to be due to the bank on April 4, 1966, if, indeed (see *Stebbins* v. *North Adams Trust Co.* 243 Mass. 69, 73–74), the particular indebtedness (for which the appropriation was made) was in existence at all on April 4. See *American Natl. Bank* v. *National Indem. Co.* 222 F. 2d 513, 518–519 (8th Cir.); *Pacific Indem. Co.* v. *Grand Ave. State Bank*, 223 F. 2d 513, 518–519 (5th Cir.); *Rodi Boat Co.* v. *Provident Tradesmens Bank & Trust Co.* 236 F. Supp. 935, 937 (E. D. Pa.), affd. 339 F. 2d 259 (3d Cir.). See also *First Natl. Bank* v. *Eastern Trust & Banking Co.* 108 Maine, 79, 81–83; *Union Trust Co.* v. *Mullineaux*, 173 Md. 124, 129–132; *R. M. Bourne & Co.* v. *Peoples Union Bank & Trust Co.* 404 Pa. 519, 525–526; *First Natl. Bank* v. *Winkler*, 139 Texas, 131, 137–138; annotation, 8 A. L. R. 3d 235, and cases there collected.[9]

The "right of set-off is given by law, apart from agreement" (see *Jefferson Union Co.* v. *American Radiator & Standard Sanitary Corp.* 329 Mass. 692, 694). We think, however, nothing in G. L. c. 231, § 5 (as amended through

---

[9] There is no occasion on these facts to consider whether Colonial would have any right of set-off in the absence of knowledge by it on April 4, 1966, of the escrow agent's interest or with respect to a debt of Kent to it matured and overdue on April 4, 1966.

St. 1945, c. 141, § 2), or in the general law of set-off, gives a bank such a right against a borrower from it, who makes a savings deposit with the bank in which the bank knows a third person has an equitable interest for which he has given value. We perceive no violation of the public policy behind c. 231, § 5, in enforcing that equitable interest and in denying any right of set-off. Cf. *Quality Fin. Co.* v. *Hurley*, 337 Mass. 150, 155.

<div align="right">

*Final decree affirmed with
costs of appeal.*