DONNA HEFFERNAN *vs.* WOLLASTON CREDIT UNION.

No. 89-P-995.

Norfolk. December 4, 1990. - March 5, 1991.

Present: DREBEN, FINE, & JACOBS, JJ.

*Secured Transactions. Uniform Commercial Code*, Bank, Security inter-
est. *Personal Property*, Bank account, Pledge. *Bank. Common Law.
Words*, "Any deposit account."

A credit union obtained an equitable security interest in the disputed por-
tion of its depositors' funds in their joint passbook savings account in
connection with a loan to a joint owner of the account, where the joint
owner executed a promissory note reciting his intention that funds in
the account be pledged to secure repayment of the loan; where the
credit union's placing a computer hold on the account (even if not suff-
icient alone to create a legally valid pledge) prevented withdrawal of
the funds by either joint owner; and where recognition of the bank's
security interest was not inequitable to any other party. [173-176]
A credit union's equitable security interest in its depositors' funds in a
joint passbook savings account, which the credit union had placed on
computer hold in connection with its loan to a joint owner of the ac-
count, was not extinguished by the death of the debtor before the loan
became due; the credit union was entitled to repay itself out of those
funds. [176-180]

CIVIL ACTION commenced in the Superior Court Depart-
ment on April 30, 1984.

The case was heard by *David H. Kopelman*, J., sitting
under statutory authority.

*Robert Mark Greenspan* for the defendant.

*Richard F. Kerr* for the plaintiff.

FINE, J. Donna Heffernan brought this action in the Supe-
rior Court against the Wollaston Credit Union (the credit
union) alleging that the credit union converted funds from a

passbook account standing in her name.[1] A former joint owner of the account had received a loan from the credit union and died before the loan became due or was repaid. The issues, tried without jury, were, first, whether a valid security interest in favor of the credit union in the disputed portion of the account was created by the former joint owner in connection with the loan and, second, whether Heffernan obtained ownership of the disputed portion of the funds in the account by the right of survivorship. The judge found in favor of Heffernan and ordered the credit union to pay her the disputed funds. We think, in the circumstances, the credit union had the right to use the disputed funds in the account to repay itself for the amount due on the loan. We therefore reverse the judgment.

We summarize the judge's findings. Heffernan and William Dore opened a joint passbook savings account at the credit union in 1982, agreeing with the credit union and with each other that all funds in the account, and interest paid on the funds, would be "owned by [them] jointly with the right of survivorship" and "subject to withdrawal by either or the survivor."[2] By June of 1983, the amount on deposit in the account was $26,488.70. Dore was seriously ill and wanted to buy a van specially suited to his declining physical condition.

On June 13, 1983, Heffernan accompanied Dore to the credit union to arrange a loan for the purchase. Dore explained to the branch manager that he wanted a three-month passbook loan in the amount of $7,933. With interest, the total amount due three months later would be $8,128.60. Dore signed a credit application entitled "secured passbook loan." He, or possibly Heffernan, furnished the passbook to

[1]Heffernan also alleged violations of G. L. c. 140D, § 23, and G. L. c. 93A, § 9. We do not discuss those claims, however, because the trial judge found for the credit union on them, and Heffernan took no cross-appeal. Had she perfected an appeal, our conclusion would be no different as the same contentions as those we discuss underlie the claims under G. L. cc. 140D and 93A.

[2]Technically, the funds on deposit in a credit union are called "shares," and the interest paid is referred to as "dividends." We use the more common terminology.

the branch manager who verified that the account contained sufficient funds to cover the loan and then returned the passbook without making any notation on it. The branch manager explained to Dore that his funds in the credit union, represented by the passbook, would be held as security for the loan. Dore signed a document entitled "Promissory Note and Disclosure Statement," which stated that he "pledge[d]" the account as security for the loan and authorized the credit union, in the event the loan was not repaid, to transfer funds from the account to reduce or extinguish the debt. A "hold" in the amount of $8,128.60 was placed on the joint account through the credit union's computer records to prevent withdrawals from depleting the balance below that amount.

Heffernan was present during the entire transaction but did not sign the note or any other document. The loan was not repaid, Dore having died six days before it became due. After the due date, Heffernan was permitted to withdraw only the excess over the amount due on the loan. Subsequently, the bank transferred $8,128.60 from the account to itself to pay off the loan.

1. *Was a valid security interest created?* It is undisputed that funds were loaned by the credit union to Dore, that Dore signed a note stating clearly the terms and conditions of the loan, and that he intended to pledge at least a portion of the amount on deposit in the joint account as security to the credit union for repayment of the loan. It is also undisputed that the credit union, by placing a hold on sufficient funds to cover the loan, took control over those funds. On the other hand, the credit union failed to take possession of, or make any notation on, the passbook and failed to obtain Heffernan's signature on any of the loan documents. Thus, there is a serious question whether a valid security interest was ever created.

The Uniform Commercial Code does not apply to security interests in "any deposit account,"[3] G. L. c. 106, §§ 9-104(*l*), 9-105(1)(*e*), and the issue is, therefore, governed by the com-

---

[3]Subject to certain exceptions not relevant here.

mon law. See *CJL Co.* v. *Bank of Wallowa County*, 71 Bankr. 261, 264 (D. Or. 1987); *Gillman* v. *Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 15 (1988); *Duncan Box & Lumber Co.* v. *Applied Energies, Inc.*, 270 S.E.2d 140, 143 (W.Va. 1980). A pledge is a form of security interest in personal property which may be created, for the purpose of securing a debt or obligation, by delivering the property to a creditor. See *Harding* v. *Eldridge*, 186 Mass. 39, 42 (1904); *Grant* v. *Colonial Bank & Trust Co.*, 356 Mass. 392, 396 (1969); Restatement of Security § 1 (1941). When a bank account is pledged as security for a loan, what the depositor transfers is an intangible property right, the right to withdraw funds from the account. See *CJL Co.* v. *Bank of Wallowa County*, 71 Bankr. at 265. The validity of a pledge of such an intangible property right is generally recognized so long as the pledgee takes possession of an "indispensable instrument" which embodies the right pledged. See *Grant* v. *Colonial Bank & Trust Co.*, 356 Mass. at 396 n.4. Thus, the right to withdraw funds on deposit in a bank or credit union may be pledged by delivery of a passbook. See *id.* at 396. See also *Stebbins* v. *North Adams Trust Co.*, 243 Mass. 69, 75-76 (1922); *Rix* v. *Dooley*, 322 Mass. 303, 308 (1948); 72 C.J.S. Pledges § 18(a) (1987).

We are faced in the present case with an attempt to pledge a portion of a savings account without transferring possession of the passbook. It is no answer on the part of the credit union that only a portion of the account was needed to secure the loan, and the depositors' retention of the passbook served the practical purpose of giving them access to the other funds in the account; at least the credit union could have noted the pledge in the passbook.[4]

---

[4]General Laws c. 168, § 40, as amended through St. 1966, c. 206, § 2, contained the following language with respect to such passbook loans: "If an appropriate notation is made on the deposit book at the time of the loan indicating that the same has been made, the deposit book may be retained by the depositor." See also G. L. c. 170, § 25A, as amended through St. 1970, c. 159 (same language with respect to accounts in cooperative banks). Both statutes have been superseded by G. L. c. 167E, § 8 (effective July 1, 1983). The quoted language is not contained in the current provi-

In arguing that it had a valid security interest, the credit union relies on the computer hold it placed on the account, effectively preventing withdrawal of the amount owed. See *American Union Fin. Corp.* v. *University Natl. Bank of Peoria*, 44 Ill. App. 3d 566, 570 (1976); *Duncan Box & Lumber Co.* v. *Applied Energies, Inc.*, 270 S.E.2d at 145-146. Compare *CJL Co.* v. *Bank of Wallowa County*, 71 Bankr. at 265; *Miller* v. *Wells Fargo Bank Intl. Corp.*, 540 F.2d 548, 563 (2d Cir. 1976). Whether the development of modern computerization has changed banking practice to the extent that other steps, such as placing a hold on the funds, should be recognized as a substitute for the actual transfer of possession of a passbook (or at least the notation thereon of the security interest) is a question we need not decide. That is because, as between Heffernan and the credit union, the credit union is entitled to prevail on the basis of applicable equitable principles.

Section 10(1) of the Restatement of Security provides that "a contract for the immediate creation of a pledge unaccompanied by delivery of the chattel does not create a pledge, but if an obligation exists or arises which it is the purpose of the transaction to secure, the intended pledgee acquires an equitable interest in the specific chattel enforceable against the intended pledgor, but not against a bona fide purchaser nor against attaching or levying creditors who have become creditors of the intended pledgor without notice of the equitable interest."

Applying § 10(1) of the Restatement to the facts of this case, Dore signed a note and a written contract with the credit union to pledge at least a portion of the account at the time he incurred an obligation to pay the loan. In addition, by placing a hold on the account, the credit union took steps which, if inadequate to create a legally valid pledge, at least established enough control over the disputed funds to prevent

sion regarding depositor loans by savings banks, see G. L. c. 167E, § 8, nor was it ever part of the comparable provision governing such loans by credit unions. See G. L. c. 171, § 24.

their withdrawal by either Dore or Heffernan.[5] In this situation, fairness justifies a recognition of the credit union's interest in the funds, even if the requirements for a pledge were not rigidly adhered to, unless the result might be inequitable to other parties. Contrast *Bonsey* v. *Amee*, 8 Pick. 236, 237 (1829); *Moors* v. *Reading*, 167 Mass. 322, 326 (1897). The only other party affected by the transaction was Heffernan. Even assuming she had no notice of the nature of the transaction between Dore and the credit union,[6] she was not a "transferee [from Dore] for value" and, thus, not a "bona fide purchaser." See Restatement of Security § 10 comment c. Nor is there any indication that, at any relevant time, she became a creditor of Dore's, or in any other way changed her position, in reliance on their retention of the passbook. Although we are aware of no other Massachusetts case decided on the basis of § 10(1) of the Restatement of Security, we consider the rule that it states to be a sound one. See *Fitzpatrick* v. *Federal Dep. Ins. Corp.*, 765 F.2d 569, 573 (6th Cir. 1985). Compare *Colbert* v. *Hennessey*, 351 Mass. 131, 142 (1966). See also *Lane* v. *School Dist. of Monessen*, 120 F.2d 479, 481 (3d Cir. 1941). Thus, we rule that at the time the credit union made the loan it obtained an equitable security interest in the disputed funds in the joint savings account.

2. *Was the security interest extinguished by the death of the party who created it?* Assuming the credit union had an equitable security interest in a portion of the funds in the joint account, the question remains whether that interest survived the death of Dore before the loan became due. Relying on principles applicable to traditional joint tenancies, the

---

[5]In this sense, the present case is distinguishable from one in which a pledgee takes no action to secure control over the pledgor's use or possession of the collateral. See *Robertson* v. *Robertson*, 186 Mass. 308, 310 (1904).

[6]Heffernan denies having such notice. While the evidence might have warranted a finding that she *had* notice, the judge made no such finding. We assume, therefore, that, even though present, she was unaware of the nature of the transaction and how her interest in the joint account would be affected by it.

judge ruled, and Heffernan contends on appeal, that any security interest was extinguished when Dore died, leaving Heffernan as the sole owner of the entire account by virtue of the account's survivorship provision.

Joint bank accounts and traditional joint tenancies share the feature of survivorship. Compare *Weaver* v. *New Bedford*, 335 Mass. 644, 646 (1957), with *Blanchette* v. *Blanchette*, 362 Mass. 518, 523 (1972). In other respects, however, a joint bank account is not the same as a joint tenancy. See *Marble* v. *Jackson*, 245 Mass. 504, 507 (1923); *Johnson* v. *Nourse*, 258 Mass. 417, 420 (1927). See also *Prescetto* v. *Colonial Trust & Sav. Bank*, 111 Ill. 2d 314, 317 (1986); *Spurlock* v. *Commercial Banking Co.*, 138 Ga. App. 892, 895 (1976). During the lifetime of the parties, a single joint tenant in a traditional joint tenancy may not convey or encumber the entire interest in the jointly-held property but only his own limited interest; any security interest in property conveyed by a single joint tenant which does not otherwise sever the joint tenancy terminates when that joint tenant dies, and the surviving joint owner takes title to the entire interest. See *D.A.D., Inc.* v. *Moring*, 218 So. 2d 451, 452 (Fla. Dist. Ct. App. 1969). Compare *Weaver* v. *New Bedford*, 335 Mass. at 646. A party to a Massachusetts joint bank account, however, has the right to withdraw all the funds in a joint account, or any portion of them. Unlike a joint tenant of property held in a traditional joint tenancy, therefore, he may effectively exercise control over the entire interest, or any part of it, and divest, totally or partially, the interest of the other. G. L. c. 171, § 10.[7] The question we

---

[7] Compare *Milan* v. *Boucher*, 285 Mass. 590, 593-594 (1934), which involved a wife's transfer from one account to another of all the funds in a joint account she had with her husband. The contract with the bank authorized withdrawals by a joint owner of the account but was silent as to assignments. The court held that the transfer from one account to another was not equivalent to a withdrawal but was only an assignment and that the effect of the assignment was to sever the joint tenancy and to transfer only her interest, found to be one-half, in the funds on deposit. To the extent that the case applied joint tenancy principles generally to joint bank accounts, it appears to be an anomaly. Of course, the legal form of a joint account is not conclusive between the parties as to its ownership. The real

must decide is whether, just as a joint owner may defeat his co-owner's right of survivorship as to funds withdrawn from a joint account, he may do the same by merely creating an equitable security interest in those funds.[8]

The statutory scheme which governs the creation and operation of joint savings accounts supports the right of one joint owner to use the account as security for a loan. See G. L. c. 171, § 24 (governing mandatory loans to depositors by credit unions).[9] General Laws c. 171, § 10, as inserted by St.

---

interest of each joint depositor may be determined in an action in equity. See *Blanchette* v. *Blanchette*, 362 Mass. at 523-524. Heffernan made no claim in the present case that when the funds were deposited in the account they were hers.

[8] Banks may avoid uncertainty in such situations by including the right to pledge in any deposit agreement signed when a joint account is opened. A deposit agreement signed by the depositors to a joint account "constitute[s] a contract between them and the bank and establishe[s] their rights in relation to the bank, irrespective of . . . whatever rights . . . they might have had between themselves." *Sawyer* v. *National Shawmut Bank*, 306 Mass. 313, 315 (1940). The deposit agreement signed by Dore and Heffernan is not dispositive as it referred only to withdrawal of funds from the account.

[9] Stating in subdivision (A)(4), as inserted by St. 1980, c. 302: "Such credit union shall, upon application by a depositor or shareholder *or by either of two joint depositors or shareholders therein*, make a loan to him, secured by his passbook in an amount not exceeding said deposit or share account for a time not extending beyond the end of the dividend period in which the loan was made" (emphasis supplied). It is highly improbable that the Legislature would require a credit union to make a loan to a single joint depositor secured by the joint account and not intend that security interest to survive the death of the debtor, notwithstanding the survivorship feature of the joint account. Because the term of the loan in issue exceeded the period referred to in the statute, the statute is not directly applicable.

General Laws c. 167D, § 5, as inserted by St. 1982, c. 155, § 9 (applicable to joint accounts in credit unions through G. L. c. 171, § 37, effective July 1, 1983, see St. 1983, c. 371, §§ 68, 105), provides that "deposits [in joint accounts] or any part thereof, or any interest thereon, may be paid to any of such persons [holding the joint account] or to any assignee or *pledgee* of any of such persons, whether the other [account holders] be living or not, provided . . . the bank . . . then has no notice in writing of any assignment or *pledge* of the account by *any* of such persons to any person other than the person to whom payment is being made hereunder. All such payments shall be valid" (emphasis supplied). Therefore, the credit union currently has the right to pay funds from the account to a pledgee of one joint depositor without liability to the other. The statute

1981, c. 279, which is directly applicable to the problem before us, provides, with respect to joint accounts in credit unions, in pertinent part:

> "Shares and deposits may be received and held in the name of a member with one or more persons as joint tenants, payable to such member or persons or the survivor or survivors of them, and any part or all of the shares or deposits and interest represented by joint accounts may be *withdrawn, assigned or transferred by any of the individual parties* . . ." (emphasis supplied).[10]

We think the authority to create a security interest, equitable or otherwise, is included within the ordinary and reasonable meaning of the authority to assign or transfer. Regarding conditional "assignments," see *O'Connell* v. *Worcester,* 225 Mass. 159, 162 (1916); *Miller* v. *Wells Fargo Bank Intl. Corp.,* 540 F.2d 548, 559 (2d Cir. 1976). Regarding "transfers," see the definitions in Black's Law Dictionary (5th ed.

---

does not limit this right to pledges made by joint depositors who are still alive. There is no reason that the protection offered by this statute should be diminished because the credit union is the pledgee as well as the institution in which the pledged account is held.

[10]The law governing joint accounts in banks generally, as distinguished from credit unions in particular, uses the same language: "may be withdrawn, assigned or transferred . . . by any of the individual parties." G. L. c. 167D, § 5. This section, although in part redundant of G. L. c. 171, § 10, currently applies to credit unions by way of G. L. c. 171, § 37. See note 9, *supra.* An earlier version of G. L. c. 167D, § 5, which applied only to joint accounts in savings banks, provided expressly for the pledge of a joint account: " Any part or all of the [joint account] may be withdrawn, assigned, *pledged* or transferred by either of the individual parties." G. L. c. 168, § 22, as amended through St. 1970, c. 305, § 2 (emphasis added). The earlier versions of c. 171, § 10, governing joint accounts in credit unions, never included the word "pledge." Although it could be argued that the Legislature's inclusion of the word "pledged" in the former version of one section regulating joint accounts and its omission from the parallel current provisions (G. L. c. 167D, § 5, first par.) evince an intent not to include the power to pledge among the rights of an individual holder of a joint account, we think such an intent unlikely given the references to pledges in the fourth paragraph of § 5 and given the broad meaning of the word "transfer."

1979) and 11 U.S.C. § 101 (50) (1988).[11] The effect under the statute of an "assignment" or "transfer" on a co-owner's right of survivorship should be no different from the effect of a withdrawal on that right.

Our interpretation is in accord with the probable intent of parties to such transactions. By making a pledge, an equitable pledge, or otherwise creating a security interest in funds on deposit with a bank, a borrower is expressing a willingness to have the funds in the account used to pay the debt when it becomes due, whatever the reason for nonpayment. A bank lending money to a depositor needs reasonable protection against nonpayment, whether caused by the debtor's financial inability to repay the loan or some other cause, such as the debtor's death. The co-owner of the account, on the other hand, is no more disadvantaged by another owner's pledging a portion of the funds than by a withdrawal. In fact, a co-owner generally is better off if the funds are pledged to the bank than if they are withdrawn as, upon repayment of the loan, the co-owner's right to use the funds would automatically be restored.

In the circumstances, we conclude that the credit union's security interest in the funds on hold in the joint account was not extinguished with Dore's death, and the credit union properly repaid itself out of those funds. We therefore vacate the judgment for the plaintiff and order judgment to enter for the defendant.

*So ordered.*

---

[11]Black's Law Dictionary defines "transfer" to include a "method . . . of . . parting with property or with an interest therein . . . absolutely or conditionally . . . [such] as a conveyance, sale, payment, *pledge*, mortgage, lien, encumbrance, gift, security or otherwise." The United States Bankruptcy Code defines "transfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest . . . ."