T.C. Summary Opinion 2012-97

UNITED STATES TAX COURT

ALVARO N. GALLEGO, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12958-10S.                    Filed October 2, 2012.

<u>Brian C. Power</u>, <u>Marissa K. Rensen</u>, and <u>Thomas C. Durham</u>, for petitioner.

<u>Erica B. Cormier</u>, for respondent.

SUPPLEMENTAL SUMMARY OPINION

PANUTHOS, <u>Chief Special Trial Judge</u>:  This case was heard pursuant to the

provisions of section 7463 of the Internal Revenue Code in effect when the petition

was filed.[1]  Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

This matter comes before the Court on petitioner's motion for reconsideration.  The matter was submitted to the Court after a trial, and the Opinion was filed on December 28, 2011 (Gallego v. Commissioner, T.C. Summary Opinion 2011-139).  Petitioner filed a motion for reconsideration.  Petitioner asserts in his motion that the Court erred in concluding that he is not entitled to innocent spouse relief for 2004[2] and that the opinion is in conflict with the Court's Opinion in Minihan v. Commissioner, 138 T.C. 1 (2012), issued after the filing of the initial Summary Opinion in this case.

Background

For convenience and clarity, we restate some of the facts and conclusions from our initial opinion.  After the motion for reconsideration was filed, we provided

---

[1]All section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[2]A decision was entered on January 4, 2012.  On January 27, 2012, respondent filed a motion to revise the decision as the decision entered inadvertently failed to include the 2003 taxable year.  On February 2, 2012, the Court issued an order vacating the decision.  An appropriate decision will be entered for 2003, 2004, and 2005 following the filing of this opinion.

the parties an opportunity to supplement the record. The record was not supplemented. We make additional findings on the basis of the existing record in the light of petitioner's motion for reconsideration.

Petitioner filed joint Federal income tax returns for 2003 and 2004 with his then wife Xochitl Lagunes Viveros Gallego (Viveros), each return showing an amount of tax due. In July 2006 petitioner learned from Viveros that although the 2003 and 2004 returns had been filed, the amounts of tax reported due on those returns had not been paid. At that time, petitioner also learned that Viveros had not been paying other personal and business debts.[3] As a result of the outstanding debts, petitioner and Viveros decided to sell the marital home. In August 2006 petitioner and Viveros received $39,059 from the home sale and together they deposited the proceeds into their joint checking account. Between August and November 2006, while caring for the couple's three children, Viveros withdrew approximately $17,000 from the joint checking account to pay various expenses including clothing, food, entertainment, travel, and lodging. In November 2006 Viveros withdrew $21,901.50 from the joint account and moved to Mexico with the three children. After Viveros left, petitioner learned that a 2005 joint return had not

---

[3]These amounts included approximately $10,000 in business debt, as well as household utility bills.

been filed. Petitioner then had a 2005 return prepared and filed, reflecting a balance due.

In October 2008 petitioner filed for divorce from Viveros. Viveros did not appear at or participate in the divorce proceedings. The Judgment of Divorce Nisi ordered Viveros to pay petitioner $10,950.75, "which is half of the money she withdrew from the parties' joint checking account at Worker's Credit Union without * * * [petitioner's] knowledge." The Judgment of Divorce Nisi also stated that petitioner and Viveros share Federal and State tax debts equally, at the time listed as $17,388.04.[4] The tax liabilities from which petitioner requested relief are attributable to his income.

## Discussion

In our initial opinion, we explained that a requesting spouse is generally ineligible for innocent spouse relief when the income tax liability is attributable to income earned by the requesting spouse. Rev. Proc. 2003-61, sec. 4.01(7)(c), 2003-2 C.B. at 296, 297, provides an exception to this requirement:

> If the requesting spouse did not know, and had no reason to know, that the funds intended for the payment of tax were misappropriated by the nonrequesting spouse for the nonrequesting spouse's benefit, the Service will consider granting equitable relief although the

---

[4]The record reflects that the 2003 Federal income tax had been fully paid at the time of the divorce and is thus not included in this amount.

underpayment may be attributable in part or in full to an item of the requesting spouse. The [Internal Revenue] Service will consider relief in this case only to the extent that the funds intended for the payment of tax were taken by the nonrequesting spouse.

I.    Joint account

Petitioner alleges that he did not have access to the joint checking account after the home sale proceeds were deposited because he returned his debit card to the bank at the end of 2005. The fact that petitioner chose not to access his bank account is not equivalent to his being denied access to his bank account. Petitioner visited the bank in August 2006 to deposit the home sale proceeds, and he is listed as a coowner on the account. Petitioner did not allege that he attempted to access the joint account and was denied access. Moreover, petitioner did not allege any reason why he could not return to the bank and (1) get a new debit card, (2) withdraw or deposit money, (3) get a bank statement, (4) change the address for the mailing of bank statements, etc. We do not conclude that petitioner lacked access to the joint account.

In our initial opinion we concluded that the money in the account constituted joint funds that could be withdrawn by either joint account owner. We relied on Massachusetts State law, which provides that "[s]hares and deposits may be received and held in the name of a member [of the credit union] with one or more

persons as joint tenants * * * and any part or all of the shares or deposits and dividends or interest represented by joint accounts may be withdrawn, assigned or transferred by any of the individual parties." Mass. Ann. Laws ch. 171, sec. 39 (LexisNexis 2009).

Petitioner cites the Court's recent Opinion Minihan v. Commissioner, 138 T.C. 1 (2012), and the cases cited therein for the proposition that the interest of each joint depositor in a joint account is dependent on the intention of the joint depositors. See Campagna v. Campagna, 150 N.E.2d 699, 702 (Mass. 1958); Buckley v. Buckley, 17 N.E.2d 887, 888 (Mass. 1938); Heffernan v. Wollaston Credit Union, 567 N.E.2d 933, 937 n.7 (Mass. App. Ct. 1991).

In Minihan, the IRS levied on a jointly owned bank account to collect the liability of the spouse that was not requesting relief under section 6015. After a partial trial, we decided on the basis of trial testimony and other evidence that the spouse requesting section 6015 relief had a separate legal interest in the levied funds so that she would be entitled to a refund of her share of the funds under section 6015(g)(1) in the event that she would ultimately be able to establish entitlement to relief under section 6015(f).

This case presents a different issue, the extent to which joint funds intended for the payment of tax were misappropriated by the nonrequesting spouse, making

the requesting spouse eligible for relief under section 6015(f). Thus, we focus on the intentions of petitioner and Viveros regarding the disposition of the funds in the joint account. It is clear that petitioner and Viveros sold the house to pay joint debts, including taxes, and deposited the proceeds into the joint account. There is nothing in the record which would lead us to the conclusion that the funds were anything other than joint funds of the owners from the sale of their house. The record is devoid of evidence reflecting separate ownership of the proceeds. Rather the record reveals that the proceeds were intended for the payment of joint debts. Viveros generally handled the family's financial affairs, and we conclude that petitioner assumed that Viveros would use the deposited funds as agreed. As a result, we look to the intended purpose of the funds as outlined in Rev. Proc. 2003-61, sec. 4.01(7)(c).

There were a number of withdrawals from the joint account after August 2006. All of the withdrawals were made by Viveros. While petitioner asserts and presents some evidence that the withdrawals for travel and entertainment represent a misappropriation, we are not satisfied that the record supports this proposition. The record reflects that there was very little income coming into the household at this point, and there is no evidence of payment by petitioner for support of Viveros or

the children during this time.[5]  Petitioner entrusted the care of his three children to Viveros, and one would expect that funds would be needed to care for the family. Without other income, the home sale proceeds represented the only source of funds for the maintenance of the family.  We find that petitioner was aware and effectively agreed that some of the funds from the joint account would be used to pay current living expenses as well as past due debts, including taxes.  Accordingly, we do not find that any of the funds withdrawn from the joint account before November 2006 were misappropriated.

The withdrawals in November 2006 of $21,901.50 are a different matter.  It appears that Viveros, without prior notice to petitioner and in contravention of the understanding between them, withdrew this amount and immediately left the United States.  Reconsidering the record and in particular giving weight to the judgement of divorce which ordered Viveros to pay petitioner $10,950.75, the Court concludes that Viveros misappropriated $10,950.75 from the joint account

---

[5]There were deposits totaling $700 between the time of the home sale and November 20, 2006.  Petitioner also had a bank account for his business that was sometimes used for personal transactions.  The record does not include any bank records for this account.  Given that petitioner alleges he did not access the joint account in 2006, we assume that he either used the business bank account to support himself or dealt in cash during this time.

in November 2006.[6]  We are satisfied that at least a portion of this amount was intended for the payment of the 2004 Federal tax liability as well as other debts.

II.    <u>Extent to which the funds were intended for the payment of tax</u>

With respect to the $10,950.75, we need to determine the "extent to which the funds were intended for the payment of tax."  The record is clear that petitioner and Viveros deposited the proceeds of the sale of the house in August 2006 to pay joint debts and current living expenses (as explained above).  We look to the existing debts in 2006 to arrive at a finding as to the extent to which the funds in the joint account were intended for the payment of taxes.  Petitioner asserts that the total joint family and business debts (including taxes) were less than the home sale proceeds.  Despite the parties' failure to supplement the record,[7] we do our best, upon further examination of documents and testimony in the record, to estimate the amount of debt in order to quantify the amount that was misappropriated and intended for the payment of tax.

---

[6]In addition to a $21,700 withdrawal on November 20, 2006, the record reflects that Viveros also made a withdrawal of $201.50 on November 24, 2006.  It appears the divorce court concluded that Viveros withdrew both the $21,700 and the $201.50 without petitioner's consent and awarded him half of that amount, or $10,950.75.

[7]We provided an opportunity for petitioner to supplement the record to enable the Court to make further findings with respect to the amount of debt (including tax) owed in 2006.  The record was not supplemented.  <u>See</u> <u>supra</u> p. 3.

Using our best judgment, we estimate that petitioner and Viveros owed $2,000 for unpaid household utilities. Also, we extrapolate from the stipulated exhibits that petitioner and Viveros' unpaid State tax debts were $3,097.85 for 2003 and $3,103.15 for 2004. See Mass. Ann. Laws ch. 62, sec. 4(b) (LexisNexis 2009) (Massachusetts State income tax rate of 5.3% on taxable income). The Federal income tax liabilities for 2003 and 2004 were $5,228 and $8,040, respectively. As indicated, petitioner had approximately $10,000 in business debts. As a result, we find that petitioner and Viveros had outstanding debts (including taxes) of at least $31,469 in 2006.[8]

When Viveros left for Mexico, she misappropriated $10,950.75 from the account that she and petitioner had intended be used to pay joint debts including taxes. This balance would not have been sufficient to fully satisfy all of those debts. Petitioner and Viveros also did not determine which debts would be paid and in what order. Given that petitioner and Viveros did not earmark any amount for payment of any particular debt, we conclude only that they intended to pay all debts

---

[8]It is not clear that on the date petitioner and Viveros deposited the home sale proceeds they intended the funds to be used for payment of the 2005 State or Federal tax liabilities, and accordingly we do not include those amounts in the calculation of the "funds intended for payment of tax". As indicated, petitioner did not learn until after Viveros left the country that the 2005 liabilities had not been paid.

outlined above equally. If the $10,950.75 was divided by the total existing debts for which the funds were intended, approximately 34.8% of the total debt would be paid.[9] Thus, $2,797.92 was both misappropriated and intended for the payment of tax.[10]

III.    Section 6015(f) relief

The requesting spouse having satisfied the threshold conditions of Rev. Proc. 2003-61, sec. 4.01, we look to see whether the requesting spouse is entitled to relief under section 6015(f) pursuant to Rev. Proc. 2003-61, sec. 4.02, 2003-2 C.B. at 298. If the requesting spouse can prove that he was no longer married to or was legally separated from the nonrequesting spouse on the date of the request for relief, had no knowledge or reason to know that the nonrequesting spouse would not pay the income tax liability, and will suffer economic hardship, relief will ordinarily be granted. Rev. Proc. 2003-61, sec. 4.02. As we will discuss below, petitioner has not shown he will suffer economic hardship and is therefore not eligible for relief under Rev. Proc. 2003-61, sec. 4.02.

---

[9]We arrived at this percentage by dividing the amount misappropriated by the total amount of the debts which the funds were intended to pay, or $\frac{10,950.75}{31,469} = 34.8\%$.

[10]We arrived at this amount by multiplying the percentage times the amount of the 2004 Federal tax liability, or 34.8% x $8,040 = $2,797.92.

Where the requesting spouse fails to qualify for relief under Rev. Proc. 2003-61, sec. 4.02, the IRS may nevertheless grant relief under Rev. Proc. 2003-61, sec. 4.03, 2003-2 C.B. at 298. The Court's analysis with respect to the nonexhaustive list of factors in Rev. Proc. 2003-61, sec. 4.03, is discussed below.

A.    Marital status

The IRS will take into consideration whether the requesting spouse is divorced or separated (whether legally separated or living apart) from the nonrequesting spouse. Rev. Proc. 2003-61, sec. 4.03(2)(a)(i). We look to petitioner's marital status at the time of trial in applying de novo review. See Wilson v. Commissioner, T.C. Memo. 2010-134. Viveros separated from petitioner as early as February 2006, and she misappropriated funds and left the marital home in November 2006. Petitioner filed for divorce in October 2008. At the time of trial petitioner was divorced. This factor weighs in favor of relief. See id.; see also McKnight v. Commissioner, T.C. Memo. 2006-155.

B.    Economic hardship

The Internal Revenue Service (IRS) will take into consideration whether the requesting spouse will suffer economic hardship if relief is not granted. Rev. Proc. 2003-61, sec. 4.03(2)(a)(ii). Generally, economic hardship exists if collection of the

tax liability will cause the taxpayer to be unable to pay reasonable basic living expenses. Butner v. Commissioner, T.C. Memo. 2007-136.

We have insufficient information with respect to the precise details of petitioner's living expenses. At the time of trial petitioner testified that he earned about $5,500 per month and quantified only his rent expense of $1,411. Petitioner did not quantify any other personal or business expenses for which he was responsible, nor did he provide any documentary evidence of his current living expenses. However, he did state that his expenses were about the same as his income but if he were unable to pay an expense, his current wife would help him pay it. Petitioner was unable to show he would suffer economic hardship if relief is not granted, and thus this factor weighs against relief. See Olson v. Commissioner, T.C. Memo. 2009-294.

C.    Knowledge or reason to know

In an underpayment case, the pertinent question is whether the requesting spouse did not know or had no reason to know that the nonrequesting spouse would not pay the income tax liability at the time the return was signed. Merendino v. Commissioner, T.C. Memo. 2006-2; Rev. Proc. 2003-61, sec. 4.03(2)(a)(iii)(A). Petitioner credibly testified that for many years, Viveros maintained the family finances and always paid the tax at the time the return was filed. At the time

petitioner signed the 2004 return, he had no reason to believe Viveros would not pay the tax. This factor weighs in favor of relief.

### D. Nonrequesting spouse's legal obligation

The IRS will also consider whether the nonrequesting spouse has a legal obligation to pay the outstanding income tax liability pursuant to a divorce decree or agreement. Rev. Proc. 2003-61, sec. 4.03(2)(a)(iv). The revenue procedure provides that the nonrequesting spouse's legal obligation "will not weigh in favor of relief if the requesting spouse knew or had reason to know, when entering into the divorce decree or agreement, that the nonrequesting spouse would not pay the income tax liability." Id.

According to the Judgment of Divorce Nisi, petitioner and Viveros were obligated to share the tax liability equally. As indicated, Viveros did not participate in the divorce proceedings, and the record does not indicate that petitioner had any reason to believe Viveros would make any payment toward the tax liability. As a result, this factor is neutral. See Schepers v. Commissioner, T.C. Memo. 2010-80.

E.    Significant benefit

The IRS will consider whether the requesting spouse received significant benefit beyond normal support as a result of the unpaid tax liability. Rev. Proc. 2003-61, sec. 4.03(2)(a)(v), 2003-2 C.B. at 299. Respondent asserts petitioner received a significant benefit by not paying the tax because he had more cash on hand for the business. However, there is no evidence of lavish expenditures or that the unpaid tax resulted in any benefit beyond normal support. Therefore, the Court concludes that this factor weighs in favor of relief. See Magee v. Commissioner, T.C. Memo. 2005-263.

F.    Compliance with Federal tax laws

The IRS will take into consideration whether the requesting spouse has made a good-faith effort to comply with the Federal tax laws in the succeeding years. Rev. Proc. 2003-61, sec. 4.03(2)(a)(vi). The record reflects that for multiple years petitioner was assessed additions to tax for failure to timely file a return, failure to pay estimated tax, and failure to timely pay the tax. However, petitioner has since fully paid the tax assessed for 2006-10. On the record as a whole, the Court

concludes that this factor is neutral.[11]  See Kelly v. Commissioner, T.C. Memo. 2010-267.

G.    Abuse and mental or physical health

The IRS will also consider whether the nonrequesting spouse abused the requesting spouse.  Rev. Proc. 2003-61, sec. 4.03(2)(b)(i).  Petitioner has not alleged that he was abused by Viveros at any time.  This is a neutral factor.  See id.; see also Magee v. Commissioner, T.C. Memo. 2005-263.

The IRS will take into consideration whether the requesting spouse was in poor mental or physical health on the date he signed the return or at the time relief was requested.  Rev. Proc. 2003-61, sec. 4.03(2)(b)(ii).  Petitioner did not claim that he was in poor mental or physical health on the date he signed the return or at the time he requested relief; therefore, this factor is neutral.  See id.; see also Magee v. Commissioner, T.C. Memo. 2005-263.

IV.    Conclusion

Of the factors listed in Rev. Proc. 2003-61, sec. 4.03, three factors favor relief (marital status, lack of knowledge or reason to know, and lack of significant benefit), one weighs against relief (economic hardship), and four are neutral

---

[11]In Notice 2012-8, sec. 4.03(2)(f)(3), 2012-4 I.R.B. 309, 314-315, the Commissioner now contends that good-faith partial compliance should be considered neutral.  See Sriram v. Commissioner, T.C. Memo. 2012-91.

(nonrequesting spouse's legal obligation, good-faith effort to comply with tax laws, spousal abuse, and mental or physical health). After considering and weighing all the factors, we find it would be inequitable to hold petitioner liable for the entire 2004 tax liability. Accordingly, we hold that petitioner is entitled to relief from joint and several liability for 2004 under section 6015(f) in the amount of the misappropriated funds that were intended for the payment of the 2004 Federal tax liability: $2,797.92.

To reflect the foregoing,

An appropriate order and decision will be entered.