In re SECTION 20 LAND GROUP, LTD., Eagle Development Co. of SW FL., Inc., Twineagles Development Co., Inc., Twineagles Golf & Country Club, Inc., V.V.V. Holding Company, Inc., Twineagles Land Group I, LLC, Talon Land Group, Ltd., Debtors.

Twin Eagles Land Group
I, LLC, Plaintiff,

v.

Chicago Title Insurance Company, Attorneys' Title Insurance Fund, Inc. and Bank of America, N.A., Defendants.

Bankruptcy No. 99–14697–9P1.
Adversary No. 00–27.

United States Bankruptcy Court,
M.D. Florida,
Fort Myers Division.

April 12, 2001.

Steven M. Berman, Tampa, FL, for debtor.

Marsha G. Rydberg, Tampa, FL, for Chicago Title.

Robert Quinn, Tampa, FL, for Attorneys' Title Insurance.

John G. Bianco, Tampa, FL, for NationsBank.

### FINDINGS OF FACT, CONCLUSIONS OF LAW & MEMORANDUM OPINION

ALEXANDER L. PASKAY, Bankruptcy Judge.

THE MATTER under consideration before this Court is a claim asserted by TwinEagles Land Group I, LLC, (TwinEagles) presented to this Court in a one-count Complaint in which TwinEagles named Chicago Title Insurance Company (Chicago Title), Attorney's Title Insurance Fund (The Fund) and NationsBank, N.A. as defendants. TwinEagles in its Complaint alleges that certain funds now on deposit in Account No. 0030–6496–7746 (the Account) initially in NationsBank and now in Bank of America are properties of the estate pursuant to 11 U.S.C. § 541 and subject to immediate turnover to TwinEa-

gles pursuant to Sections 542 and 543, as well as the Federal Rules of Bankruptcy Procedure, FRBP 6002 and 7001 (sic).

In due course, Chicago Title filed its Answer to the Complaint setting forth some admissions and some denials. In addition, Chicago Title asserted four separate "Defenses" (sic), such as, the First Defense is states "The Complaint fails to state a claim for relief," which is, in fact, a Motion to Dismiss. The Second Defense is based on the assertion that the funds on deposit are "cash collateral," thus it is not required to turn over the funds unless it receives adequate protection.

The Third Defense is based on the contention of Chicago Title that the account is an "escrow account" set up to protect and indemnify Chicago Title and may not be released unless the conditions of the escrow have been satisfied, including the full indemnification of Chicago Title against all losses, costs and damages, including attorneys' fees and costs.

The Fourth Defense of Chicago Title is based on the allegation that TwinEagles has no equity in the funds; that the real controversy is between the secured creditors and not between TwinEagles and Chicago Title, therefore, TwinEagles has no cognizable interest in the funds.

Also, in due course, The Fund filed its Answer in which it set forth some admissions and some denials, including one defense contending that the funds in the Account are not property of the estate because they are funds in escrow and the conditions for the release of escrow funds have not been established.

NationsBank who was named as a Defendant, and has been acquired in the interim by Bank of America N.A., failed to file an Answer, but it is conceded by Bank of America that it has no interest in the funds and that it is merely a stakeholder

and willing to turn over the funds to the entity found to be entitled to the balance in the Account by this Court.

At the pretrial conference this Court determined that the scope of the Final Evidentiary Hearing would be limited to two narrow issues: (1) whether the funds in the Account were TwinEagles' monies and (2) whether Chicago Title and the Fund have a validly created and perfected security interest in the Account. This Court stated that it would not consider the allowance, *vel non*, of any claims for breach of contract, indemnification or otherwise, asserted by Chicago Title or the Fund.

The facts relevant to the issues as framed by the pleadings as established at the duly scheduled Final Evidentiary Hearing can be summarized as follows:

At the time relevant TwinEagles owned certain residentially zoned and platted real property in Naples, Florida, including a tract referred to as Phase I of the total complex acquired by TwinEagles. Phase I was designed to be an upscale golf course and residential development consisting of five-acre home lots with above average amenities surrounding the golf course.

The project was financed by Textron Financial Corporation (Textron), who requested that The Fund issue a mortgagee title insurance policy in order to protect Textron's interest in the Phase I development. Textron needed the title insurance policy to protect its mortgage interest against possible lien claims of mechanics and materialmen who worked as subcontractors on the construction of the project.

As noted earlier, The Fund had already issued a mortgagee's title insurance in favor of Textron Financial Corporation, the major lender of TwinEagles. TwinEagles commenced developing the Phase I property and, in fact, was in the process of

building the golf course and had completed the construction of several residential homes and sold 19 residential lots. In order to market the properties developed, including both vacant lots and homes actually constructed, TwinEagles was in need of a title insurance policy insuring the purchasers against any possible lien claims against the properties by subcontractors.

The law firm of Annis, Mitchell, Cockey, Edwards & Roehn, P.A. (Annis Mitchell) had represented TwinEagles since 1997 and, in conjunction with the sale of property in Phase I, also acted as the issuing agent for title insurance policies on behalf of Chicago Title and The Fund. The negotiations by Annis Mitchell with Chicago Title, The Fund and TwinEagles for title insurance policies culminated in the execution of a document entitled, "Agreement with Deposit to Protect Against Defects in Title" (Agreement with Deposit).

As indicated by the Agreement with Deposit, in consideration for title insurance from Chicago Title and the Fund, TwinEagles agreed to:

> forever fully to protect, defend and save harmless Title Companies from and against the above mentioned rights, interests, liens, claims, encumbrances and defects in title, and each and every of the them and against any right, interest or defect growing out of the same and against all loss, costs, damages and attorneys' fees and expenses of very kind and nature which it may suffer, expend or incur or by reason, or in consequence of, said title insurance policies, including loss, costs, damages, fees and expenses incurred in actions brought to enforce this Agreement; to defend at undersigned's own costs any and every suit, action or proceeding in which such rights, interests, liens, claims or encumbrances are asserted against said real estate.

In addition to the above obligations, the Agreement with Deposit provided that in consideration for title insurance from Chicago Title and the Fund, TwinEagles agreed that it "hereby delivers to Chicago Title Insurance Company funds as set forth below, to indemnify Title Companies as herein provided and for the other purposes herein set forth. Said funds so deposited are as follows: $1,456,287.00 to be deposited in a money market account at [Bank of America]." The Agreement with Deposit also provided that Chicago Title would reimburse TwinEagles in an amount equal to the amount paid to the contractors from time to time subsequent to the date of the Agreement.

In order to obtain the release of funds, TwinEagles had to satisfy several conditions, including providing certain documentation to Chicago Title, a certification from the architect or engineer as to the balance of the cost to complete the project, and a title search disclosing no liens have been filed against the property covered by the policy.

The Agreement with Deposit further provided the following:

> Notwithstanding the disbursement provision contained in the preceding paragraph, the amount of funds to remain on deposit under this Agreement will equal the cost of completion ... If it appears from the certification that the funds remaining on deposit under this Agreement are less than the cost to complete the Project, the undersigned shall deposit the difference with Chicago Title within ten (10) days from receiving notice of this deficiency, to be held under the terms of this Agreement, and no funds will be released from the terms of this Agreement until such time as the additional deposit is made.

Pursuant to the Agreement just outlined, Chicago Title issued its title policies covering only Phase I of the project. As noted earlier, The Fund issued its policy covering only the interests of Textron on the properties on which Textron held the mortgage.

Pursuant to the Agreement, the funds held in the Account by Annis Mitchell as counsel for TwinEagles were wire transferred November 16, 1998, to Chicago Title and deposited in the Account entitled "Chicago Title Insurance Company Custodial Escrow Deposit Account." Chicago Title requested the Bank to transfer these funds from the Custodial Escrow Account to a money market account pursuant to a Master Escrow Agreement. The funds ultimately ended up in the Account opened in the name of TwinEagles Land Group I, LLC, by Chicago Title Insurance Company as Agent. It is without dispute that under the terms of the Agreement no funds could be withdrawn from the Account without Chicago Title's consent. It is clear that the funds were deposited for the sole purpose to assure that funds would be available to pay subcontractors and in the event Chicago Title was required to satisfy any possible lien claims which might be asserted against the property sold by TwinEagles in Phase I.

Disbursements from the Account required authorized signatures from two Chicago Title employees who are named in Chicago Title's Master Escrow Agreement. Only Chicago Title had access to the Account. Before any funds could be released pursuant to a draw request by TwinEagles, both Annis Mitchell and Chicago Title had to approve the request.

Under the terms of the Agreement, TwinEagles could request that Chicago Title release money from the Account to pay the invoices of subcontractors who worked on the construction of the golf course improvements. TwinEagles was required to submit documentation, consisting of lien waivers, payment applications, and a certificate estimating the remaining cost to complete the golf course improvements.

It is clear that none of the funds on deposit could be used by TwinEagles for any purpose, other than to pay outstanding bills during the construction to subcontractors to prevent lien claims on the property. These funds were dedicated solely for this purpose, and neither TwinEagles nor Chicago Title could utilize these funds to pay any expenses other than those expenses related to properties covered by the title insurance policies.

On December 10, 1998, TwinEagles, through their attorneys at Annis Mitchell, sent a letter asking Chicago Title to release the $1,040,262.00 from the Account, and agreed that Chicago Title can hold the balance necessary to complete the golf course, $416,025.00, until all work on the golf course was completed and all other terms of the Agreement were satisfied.

After repeated unsuccessful attempts to obtain confirmation, the proponents of the Plan obtained the requisite vote for approval and this Court entered an Order Confirming Debtors' Fourth Amended and Restated Joint Chapter 11 Plan (the Plan) dated as of March 27, 2000, and amended as of May 24, 2000, June 16, 2000, July 29, 2000. On August 7, 2000, the proponents of the Plan obtained the requisite vote for approval and the Plan was confirmed first on August 15, 2000, and a second time by a Supplement to the Confirmation Order entered on August 25, 2000. The Plan also approved the Sale of Property and Assets and/or Equity Interests of Phase I, Phase II, 3A and 3B to Resource Conservation Properties, Inc., an Affiliate of Bonita Bay Properties, Inc., free of all claims of liens and encumbrances.

At the commencement of the case, there were unpaid bills due to subcontractor claims in excess of $1 million. Some of these subcontractors failed to perfect their lien rights under State law; however, fifty or more filed claims in these Chapter 11 cases. Pursuant to the Plan of Reorganization, some of the properties including Phase I were sold free and clear of liens with the exception of the liens of Udelson Equipment Company and Florida State Underground, who opted out under the Plan. These two lien holders agreed to satisfy their liens from the funds involved in this controversy if TwinEagles prevails.

As noted earlier, TwinEagles asserts a claim of turnover pursuant to Section 542 and Section 543. It should be noted at the outset that the relief sought under Section 543 is inappropriate for the simple reason that this Section deals with turnover from a custodian. Clearly, Chicago Title never was a custodian within the meaning of that term as defined by Section 101(11).

This leaves for consideration, the demand for turnover pursuant to Section 542. 11 U.S.C. § 542(a) requires turnover only if two conditions are met. The property in question must be property of the estate and the debtor must have the right to use, sell or lease the property under Section 363 of the Code. " '[C]ash collateral' means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest . . ." 11 U.S.C. § 363(a). If this Court finds that Chicago Title and the Fund have a security interest in the Account, then the Account is "cash collateral." Even if this Court finds that the balance in the Account is property of the estate, turnover could not be ordered without providing the creditor adequate protection.

Chicago Title and the Fund assert that an escrow relationship exists among the parties and therefore, the Account is not subject to turnover since it was not property of the estate. Under Florida law, an escrow is established by "an instrument embodying conditions mutually beneficial to both parties . . . and it must be communicated to and deposited with a third party." *Gibson v. Resolution Trust Corp.*, 51 F.3d 1016, 1021 (11th Cir. 1995) (*citing Aberbach v. Wekiva Assocs.*, 735 F.Supp. 1032, 1035 (S.D.Fla.1990)). The third party must not itself be involved in the transaction. *E.g., Fleischman v. Dept. of Professional Regulation*, 441 So.2d 1121, 1123 (Fla. 3d DCA 1983). Upon delivery of the res to a third person in escrow, the grantor by his act of delivery loses all control over the res. *E.g., Aberbach*, 735 F.Supp. at 1035.

Under the law established by the authorities cited, no escrow was ever effectively established. This record leaves no doubt that an Escrow Agreement, as such, was never executed appointing an Escrow agent even though the term "escrow" has been used at times. Be that as it may, while one may find and conclude that the parties did indeed intend to establish an escrow, none of these requirements were met in the present instance.

It cannot be disputed that before funds can be considered to be escrow funds and a party to be considered an escrow agent, the agent must be neutral, objective and without a claim against the funds. It needs no detailed discussion to point out that neither Chicago Title nor the Fund is neutral. As a matter of fact, they vigorously assert claims to the funds in controversy. In light of the foregoing, this Court is satisfied that the balance in the Account is not funds in escrow and is property of the estate.

In the alternative, Chicago Title and the Fund claim that the Agreement with Deposit was, in fact, a security agreement that created a security interest, and that this security interest was perfected by possession since Chicago Title had control of the funds. The issue of whether or not the Fund or Chicago Title have enforceable secured claims against the funds would ordinarily be governed by Article 9 of the Uniform Commercial Code (U.C.C.).

"Deposit account" means a "demand, time, savings, passbook or like account maintained with a bank ..." Fla. Stat. § 679.105(1)(e). Thus, it is clear that the funds in the current Account in Bank of America is a deposit account, and the interest in a "deposit account" is expressly excluded from Article 9 pursuant to Fla. Stat. § 679.104(12).

It should be noted that effective July 1, 2001, deposit accounts *will* be covered by Revised Article 9, Secured Transactions. U.C.C. § 9–102(a)(29) (2000 Revision).

Revised U.C.C. § 9–104 is entitled "Control of Deposit Account." A secured party has control of a deposit account if the debtor, secured party, and the bank have agreed in an authenticated record that the bank will comply with instructions originated by the secured party directing disposition of the funds in the deposit account without further consent by the debtor. U.C.C. § 9–104(a)(2) (2000 Revision). Therefore, Revised Article 9 would require this Court to focus primarily on which party had control over the Account. This revision is clearly an adoption of the well recognized importance of "control" of a common law pledge.

However, the revisions to Article 9 will not become effective until July 1, 2001, if adopted by the Legislature, and the governing law is as it exists today, which excludes "deposit accounts" from Article 9 of the U.C.C.

This being the case, the Account and the funds remaining in the Account, about $430,000.00, is not cash collateral based on a security interest unless this Court accepts the proposition urged by Chicago Title and The Fund that the Agreement with Deposit was, in fact, a pledge of the funds and their interest is based on a valid common law pledge.

■ The common law of pledge—perfection by possession—predates, and was incorporated by, the U.C.C. *Kunkel v. Sprague National Bank*, 128 F.3d 636 (8th Cir.1997). "A pledge is a bailment or delivery of goods or property to a creditor by way of security for the performance of an act or engagement or the security of a debt.... Security is the very essence of the pledge; the law of it is determined by contract which in the case at bar is fixed by the statute, and the pledgee is not only entitled, but he is required, to retain possession of the property until the purposes of the pledge are satisfied." *Therrell v. Filer*, 101 Fla. 192, 133 So. 861, 863 (1931).

A common law pledge is defined as "a security interest in a chattel or in an intangible represented by an indispensable instrument, the interest being created by a bailment for the purpose of securing the payment of a debt or the performance of some other duty." *In the Matter of Zimmerman*, 69 B.R. 436, 438 (Bankr.E.D.Wis. 1987). The continuing vitality of a common law pledge is evident that the pledge of a savings account falls outside the scope of the Uniform Commercial Code and is governed by common law. *In the Matter of Zimmerman*, 69 B.R. at 438 n.1 (citing §§ 409.104(13), 409.105(1)(e), Wis. Stats.; *Duncan Box and Lumber Co. v. Applied Energies, Inc.*, 165 W.Va. 473, 270 S.E.2d 140, 143 (1980); and *Walton v. Piqua State Bank*, 204 Kan. 741, 466 P.2d 316, 327 (1970)).

The elements of a pledge include an intention to pledge collateral as security and possession of the collateral by the pledgee or by a third person acting on the pledgee's behalf for the purposes of securing a debt. *Miller v. Wells Fargo Bank Int. Corp.*, 540 F.2d 548, 561 (2nd Cir. 1976). The elements of a pledge are a pledgor and a pledgee, a debt or obligation, an agreement to create a security interest, and possession of the pledged property by the pledgee. *In re CJL Co., Inc.*, 71 B.R. 261, 264 (Bankr.D.Or.1987). To be effective, the pledgee's possession has to be complete, unequivocal and exclusive of the pledgor's possession in his own right. *Id.* at 264–65. The possession of the property protected by the pledge is sufficient; no filing or other notice is required. *Id.* at 265.

Modern courts have grappled with applying the common law pledge to the creation of a security interest in a deposit account, where there is no instrument specifically creating a pledge. *In re Interstate Department Stores, Inc.*, 128 B.R. 703, 705–06 (Bankr.N.D.N.Y.1991). The *Interstate* court explains that in *Miller v. Wells Fargo, supra,* the Court of Appeals for the Second Circuit in addressing this issue

> refined the traditional common law indispensable document rule to require that the pledgee of a deposit account have exclusive control and irrevocable authority over the account. [T]he court rejected the claimed security interest of a bank in and to an overseas account. The bank's possession of the only Telex key and key code was insufficient to establish that it alone had control over the account.

*In re Interstate Department Stores, Inc.,* 128 B.R. at 706 (citing *Miller,* 540 F.2d at 563). The *Interstate* Court continued that the same analysis was employed by the court in *In re CJL Co., Inc., supra,* in finding a bank's rights as pledgee of a deposit account to which it had exclusive control superior to the debtor which had lost the right to access those funds. *Interstate,* 128 B.R. at 706 (holding that security documents purporting to unequivocally pledge to secured creditor the readvances to debtor from secured creditor deposited into debtor's operating account at bank did not create valid pledge under New York common law, as creditor did not have exclusive control over the funds).

The Court ruled in favor of the Chapter 7 trustee in an adversary proceeding seeking turnover of funds in debtor's employee savings account in *In the Matter of Zimmerman, supra.* It held that neither debtor's employer, as pledgee of funds in debtor's employee savings account, nor the trust company that maintained the account ever had exclusive possession and control over the savings account, so that the debtor never relinquished interest in the funds and the pledge was never perfected. *Zimmerman* also cited *Miller* in its reasoning since the court in *Miller* found that the bank failed to establish that the telex key number gave it irrevocable authority over the account or that the depositor could not have gained access to the account. *Zimmerman,* 69 B.R. at 438 (citing *Miller,* 540 F.2d at 563).

All parties cite *LDM Development Corp.,* 211 B.R. 348 (Bankr.D.Minn.1997). In *LDM,* creditors, which held security interest in purported escrow deposit previously made by Chapter 11 debtor corporation in connection with its sale of real property, moved for stay relief, seeking to collect the debt from the title company holding the account. The Court in *LDM* found an "Agreement With Deposit to Protect Against Defects in Title" a "security agreement." With the execution of the security agreement by LDM and Chicago

Title taking possession of the funds, Chicago Title became a pledgee with a perfected security interest in the funds. The rest of the discussion focused on the rights of a junior lienholder to get relief from stay. As for the junior lienholder, the common law pledge, possession of funds by pledgee, and lack of control of the funds by the debtor was enough to overcome the lack of filing of the UCC–1 financing statement and perfect the security interest in the funds.

Although the facts of this case are similar to the instant case in that a deposit was made to assure satisfaction of liens clouding title on properties covered by the title policies, this Court finds that the *LDM* case has an important distinction. The *LDM* Court made its decision on both liens pursuant to the Uniform Commercial Code as adopted in Minnesota, and the current Florida adaptation of the U.C.C. expressly excludes deposit accounts.

Both Revised Article 9 and the common law pledge of deposit account focus on control of the funds in the deposit accounts. This Court is not oblivious of the undisputed facts that Chicago Title's possession and control over the funds was not in the pragmatic sense exclusive and superior to the interest of TwinEagles. Chicago Title's and The Fund's control was not absolute and not unrestricted since none of the funds on deposit could have been used by Chicago Title for any purpose other than for the purposes set forth in the Agreement.

Notwithstanding, this Court is still of the opinion that this is distinction without difference. In spite of the restrictions as to the use of the funds, the power to draw checks on the Account, albeit pursuant to the request made by Annis Mitchell, was strictly within the power of Chicago Title and at no time could TwinEagles actually draw any checks on the Account. Pursuant to the case law cited above, Chicago Title has a cognizable interest in the funds as a common law pledgee.

There is nothing in this record which indicates that there are or will be any further lien claims made on the title insurance policies issued by Chicago Title and The Fund. From all this, it follows that while Chicago Title and the Fund are pledgees of the funds remaining in the Account, since there are no longer any claims remaining against the funds the funds should be turned over to Twin Eagles, with the proviso that the funds on hand are subject to the claims for attorneys' fees and costs.

The Agreement with Deposit further provides the following:

> [i]n case the rights, interest, liens, claims, encumbrances, defects in or objections to the title aforesaid are paid, discharged, satisfied or removed from the title to said real estate to the satisfaction of Title Companies ... or in case any surplus remains in the hands of title Companies after it shall have used the fund in the manner hereinbefore provided and shall have reimbursed itself for all loss, damages or disbursements, such ... surplus, after deducting the costs, expenses, fees for service and attorney's and solicitors' fees, if any, of Title Companies of all outstanding receipts for said fund, be paid or delivered to TwinEagles Land Group.

This Court finds that the Agreement with Deposit does provide for attorneys' fees and costs.

Based on the foregoing, this Court finds that the funds on deposit in the Account are property of the estate subject, however, to the valid interest of Chicago Title and the Fund as a result of a common law pledge. For this reason, only the surplus may be turned over to the estate, if any,

after determination by this Court as to the reasonable amount of attorneys' fees and costs which the title companies are entitled to pursuant to the Agreement with Deposit.

Accordingly, it is

ORDERED, ADJUDGED AND DE-CREED that the funds on deposit in the Account are property of the estate subject, however, to the valid interest of Chicago Title and the Fund as a result of a common-law pledge. For this reason, only the surplus may be turned over to the estate, if any, after determination by this Court as to the reasonable amount of attorneys' fees and costs which the title companies are entitled to pursuant to the Agreement with Deposit.